ERWIN RANDOLPH NUTTER *v.* STATE
OF MARYLAND

[No. 200, September Term, 1969.]

*Decided February 10, 1970.*

The cause was argued before MURPHY, C.J., and AN-
DERSON, MORTON, ORTH, and THOMPSON, JJ.

*Milton B. Allen* for appellant.

*John J. Garrity, Assistant Attorney General,* with
whom were *Francis B. Burch, Attorney General, Charles
E. Moylan, Jr., State's Attorney for Baltimore City,* and
*Michael E. Kaminkow, Assistant State's Attorney for
Baltimore City,* on the brief, for appellee.

ORTH, J., delivered the opinion of the Court.

## I

## THE PRIVILEGE OF NONDISCLOSURE OF THE IDENTITY OF INFORMERS

*The Rule*

In Maryland the State has the privilege to withhold
from disclosure the identity of persons who furnish in-
formation to police officers concerning the commission of
crimes. This general rule was recognized in *Drouin v.
State,* 222 Md. 271 and reaffirmed in *Gulick v. State,* 252
Md. 348. "That the government has this privilege is well
established, and its soundness cannot be questioned." 8
*Wigmore, Evidence* (1961) § 2374, p. 762. Its purpose
is the furtherance and protection of the public interest in
effective law enforcement. *Roviaro v. United States,* 353

U. S. 53, 59. Professor Wigmore, characterized by the Supreme Court as "not known as an enthusiastic advocate of testimonial privileges generally," *McCray v. Illinois*, 386 U. S. 300, 309, noted that such a genuine privilege must be recognized and said, § 2374, pp. 761-762:

"Communications of this kind ought to receive encouragement. They are discouraged if the informer's identity is disclosed. Whether an informer is motivated by good citizenship, promise of leniency or prospect of pecuniary reward, he will usually condition his cooperation on an assurance of anonymity — to protect himself and his family from harm, to preclude adverse social reactions and to avoid the risk of defamation or malicious prosecution actions against him. The government also has an interest in nondisclosure of the identity of its informers. Law enforcement officers often depend upon professional informers to furnish them with a flow of information about criminal activities. Revelation of the dual role played by such persons ends their usefulness to the government and discourages others from entering into a like relationship."

Of course, the privilege applies only to the *identity* of the informer,[1] and not to his communication as such. And

---

1. Informers have been classified as:
   (1) *Casual Informers*—those persons who live on the fringes of crime and often have associations and information that are useful to the police. Police involvement begins at the end of the process, not the beginning;
   (2) *Decoys and Stool Pigeons*—similar to the casual informer but their objective is not simply to acquire information but to "test" individuals or to patrol an area "actively" by providing a likely looking target for a dope peddler;
   (3) *Police Spy*—a full time, professional police informant. His objective is the acquisition of information. He is recruited and paid by the police and works at their direction against targets chosen by the authorities. He is used where greater reliability is necessary than is possi-

the privilege is not absolute; it is limited by its underlying purpose. The obvious qualification is that once the identity of the informer has been disclosed to those who would have cause to resent the communication, the privilege is no longer applicable. *Roviaro v. United States, supra,* at 60.[2] See *McCoy v. State,* 216 Md. 332, 337. But the real exception to the rule may not be so obvious, but is just. It arises from the fundamental requirements of fairness. The identity of the informer must be disclosed when it is necessary and relevant to a fair defense. *Gulick v. State, supra,* at 354 and 357. Or as the Court said in *Drouin v. State, supra,* at 286, disclosure is compelled "if the name of the informer is useful evidence to vindicate the innocence of the accused, lessens the risk of false testimony or is essential to a proper disposition of the case." In *McCoy v. State, supra,* at 337, the Court stated the exception to be "whenever the informer was an integral part of the illegal transaction."[3] The Court also said in *Gulick v. State, supra,* at p. 354:

ble with a casual informer or where the target individual or group presents difficulty of access;

(4) *Police Undercover Agent*—distinguished from the police spy by his official status as a member of some official law enforcement agency. He may be used when the danger or sensitivity of the mission makes the use of unofficial agents impossible;

(5) *Agent Provocateur*—has the task of provoking criminal activity on the part of target individuals or groups and may have either official or unofficial status. (But see *Simmons v. State,* 8 Md. App. 355 (1969), in which we discussed entrapment).

The above classifications are set out in an Editorial Note entitled "Police Undercover Agents: New Threat to First Amendment Freedoms" in *The George Washington Law Review,* vol. 37, no. 2 (March 1969), 639.

2. Or as *Wigmore* says, § 2374, p. 766: "If the identity of the informer is admitted or known, then there is no reason for pretended concealment of his identity, and the privilege of secrecy would be merely an artificial obstacle to proof."

3. *Wigmore,* § 2374, pp. 768-769, puts it:

"Even where the privilege is strictly applicable, the *trial court may compel disclosure* if it appears necessary in order to avoid the risk of false testimony or in order to secure useful testimony. For example, disclosure will be compelled if the informer is a material witness on the issue of guilt."

In *McCormick, Law of Evidence* (1954) § 148, p. 310 the lan-

"The cases universally recognize the exception to the nondisclosure privilege where the informer was a participant, accessory or witness to the crime. See *McCoy v. State*, 216 Md. 332, 337 * * *; *The Evidence Handbook, Donigan & Fisher*, (1965) Evidentiary Privileges § 7, pg. 214."

We do not think this is a separate exception, distinct from the exception described in the terms of necessity and relevancy to a fair defense. We believe that if an informer is a participant, accessory or witness to the crime it is a factor to be considered in determining whether his identity is necessary and relevant to a fair defense. And we feel that "witness" as used in *Gulick* means a material witness, in the sense that his testimony is *important* to a fair determination of the cause. It is then that his identity becomes necessary and relevant to a fair defense. Thus in this context "material" may be said to have a meaning more restrictive than its usual meaning. So, although an eyewitness to a crime is clearly a 'material" witness as that word is ordinarily used, if he is an informer, simply observing an illegal transaction but not participating in it, the fact that he observes the transaction does not necessarily make his possible testimony so important as to compel disclosure of his identity in the face of the rationale of the nondisclosure privilege. *Donigan & Fisher*, cited in support of the statement

---

guage is, "[W]hen * * * the evidence of the identity of the informer becomes important to the establishment of defence * * *."

Wharton, remarking in his *Criminal Evidence* (12th Ed., 1955) vol. 3, § 795, pp. 136-137, that the distinction of the exception to the general rule is one of materiality, says, "When such information is material to the issue, it cannot be withheld. But when it is immaterial the courts will not compel its disclosure."

Underhill, *Criminal Evidence*, (5th Ed.) vol. 2, § 328, p. 820, also speaks in terms of materiality: "[W]hen the question arises in a criminal trial, and the information is material to determine the defendant's innocence, it would seem both reasonable and just that the necessity and desirability of the disclosure and the question whether the public interests would be benefited or would suffer, should be solely for the judicial discretion upon the circumstances of the case."

in *Gulick,* said, "When the identity of an informer becomes material to the establishment of a defense, the court will order its disclosure." They quoted *Roviaro v. United States, supra,* in support thereof, and in *Roviaro* the Government's informer was the sole participant, other than the accused, in the transaction charged and was the only witness in a position to amplify or contradict the testimony of government witnesses. Thus it was clear, and the Court so found, that the informer was a material witness, his possible testimony being "highly relevant and might have been helpful to the defense." 353 U. S. at 63-64. *Donigan & Fisher* concluded, pp. 215-216:

> "Thus where the informer is an active participant in the illegal activities disclosed by him, his actions and identity can become part of the *res gestae* and concealment of his identity might hamper the accused in making his defense by depriving him of the testimony of a material witness."

*McCoy,* also cited in *Gulick,* is not contrary to our interpretation. There the exception was stated in terms of the informer being an integral part of the illegal transaction and *Roviaro* was discussed in support thereof. *Lee v. State,* 235 Md. 301, supports our interpretation.

In *Smith v. Illinois,* 390 U. S. 129, the principal witness for the prosecution was a man who identified himself on direct examination as "James Jordan." This witness testified that he had purchased a bag of heroin from the petitioner in a restaurant with marked money provided by two police officers. The officers corroborated part of his testimony but only this witness and the petitioner testified as to the crucial events inside the restaurant, and the petitioner's version of those events was entirely different. "The only real question at the trial, therefore, was the relative credibility of the petitioner and this prosecution witness." at 130. On cross-examination the witness admitted that his real name was not "James Jordan." Objection to inquiry as to his real name

and address were sustained. The Court reversed, holding that under the standard of *Alford v. United States,* 282 U. S. 687, the defendant was denied the right to confront the witnesses against him, guaranteed to him under the Sixth and Fourteenth Amendments of the federal constitution. The Court noted that its decisions in *Roviaro* and *McCray* were not relevant as in neither of those cases was the informer a witness for the prosecution. 390 U. S., note 8, at 133.

It appears, therefore, that if an informer testified for the prosecution at trial, the State's privilege of nondisclosure is not applicable and may not be invoked, yielding to the Sixth Amendment right of confrontation.[4]

*The Application of the Exception*

We think it clear that today the exception to the general rule of the State's privilege of nondisclosure of the identity of an informer applies to the issue of guilt or innocence as distinguished from the issue of probable cause for a warrantless arrest or warrantless search, or for the issuance of an arrest warrant or search and seizure warrant. Although in *Drouin v. State, supra,* the Court considered the exception with regard to probable cause for an arrest, that case was decided without the benefit of *McCray v. Illinois, supra.* In *McCray* the Court, pointing out that *Roviaro* involved the privilege "at the trial itself where the issue was the fundamental one of innocence or guilt," and not on the issue of probable cause of an arrest or search, 386 U. S. at 309, "made it crystal clear," as we said in *Mullaney v. State,* 5 Md. App. 248, note 4 at 254, "that there is no requirement,

---

4. It would seem that the holding in *Smith* would apply even if the witness appeared at trial with his facial features covered or otherwise disguised. The concealment of identity between not giving a real name and address and disguise would be a matter only of degree. Although in *Smith* the informer was physically before the accused, his actual identity was unknown. Thus the obvious exception to the privilege of nondisclosure—that the informer's identity was in fact known to the accused—was not applicable.

It would also seem that the rationale of *Smith* would apply if an informer testifies for the State on the issue of probable cause for an arrest or search.

constitutional or otherwise, which compels disclosure of the informant's identity on a hearing to determine the question of probable cause for an arrest or search." And see *Rollins v. State*, 5 Md. App. 495, 498.[5] In *Gulick v. State, supra,* the issue was not probable cause for an arrest or search but the demand for disclosure concerned the identity of an individual who gave the law enforcement authorities a "tip" on the relevancy to the crime of an object already in the possession of the police. The Court held that disclosure of the identity of the informer was not required because it was not necessary and relevant to a fair defense. 252 Md. at 357.

*The Invoking of the Exception*

The exception to the general rule of the State's privilege of nondisclosure of the identity of an informer must be invoked by the defendant. "Even though a case is a proper one for disclosure, the court will not on its own motion require the government to reveal the source of its information; the defense must demand disclosure and, if it is refused, move to strike the related testimony or to dismiss the action, as circumstances indicate." 8 *Wigmore, Evidence* (1961), § 2374, pp. 771-772. And we think it clear from *McCoy v. State, supra,* that if the defendant fails to make demand for the name or identity of the informer at trial, he waives the right to such disclosure. The Court in *McCoy* considered this "an exception to the exception." 216 Md. at 337.

Once demanded, whether disclosure is to be compelled is within the sound discretion of the trial court. *Gulick v. State, supra,* at 354. "The problem calls for a balancing of the public interest in protecting the flow of information against the individual's equal, if not predominant, right to a fair defense. The privilege of nondisclosure of the informer is not absolute, but it must not be withdrawn unless a necessity for the identity, and its rel-

---

[5] Of course the requirements of showing the credibility of an informer in establishing probable cause is another matter. See *Price v. State*, 7 Md. App. 131, in which we discussed *Spinelli v. United States*, 89 S. Ct. 584 and *Aquilar v. Texas*, 378 U. S. 108.

evancy to a fair defense, is demonstrated." *Id.* at 357. "We believe that no fixed rule with respect to disclosure is justifiable. * * * Whether a proper balance renders nondisclosure erroneous must depend on the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors." *Roviaro v. United States, supra,* at 62.

We note that the Court in *Roviaro* said that when the privilege must give way the trial court may require disclosure and, if the government withholds the information, dismiss the action. Id., at 61. See *Gulick v. State, supra,* at 355.

*Summary*

The State has the privilege to withhold from disclosure the identity of persons who furnish information to police officers concerning the commission of crimes. However, the privilege is not absolute. On the issue of guilt or innocence and upon demand by the defendant, the trial court may, in the exercise of its judicial discretion, compel such disclosure upon determination that it is necessary and relevant to a fair defense. Factors to be considered in ascertaining whether such disclosure is necessary and relevant to a fair defense include the nature of the crime charged; the importance of the informer's identity to a determination of innocence, as for example, whether or not the informer was an integral part of the illegal transaction and the possible significance of his testimony; and the possible defenses. Whether the privilege must yield depends on the facts and circumstances of the particular case. But if the informer testifies for the State the privilege may not be invoked by it.

## II

In *Lewis v. United States,* 385 U. S. 206, Mr. Chief Justice Warren, speaking for the Court, noting that both the Government and petitioner "recognize the necessity for some undercover police activity and both concede that the particular circumstances of each case govern the ad-

missibility of evidence obtained by stratagem or deception," said, at 208-210:

> "Indeed it has long been acknowledged by the decisions of this Court * * * that, in the detection of many types of crime, the Government is entitled to use decoys and to conceal the identity of its agents. The various protections of the Bill of Rights, of course, provide checks upon such official deception for the protection of the individual. * * * Were we to hold the deceptions of the agent in this case constitutionally prohibited, we would come near to a rule that the use of undercover agents in any manner is virtually unconstitutional *per se*. Such a rule would, for example, severely hamper the Government in ferreting out those organized criminal activities that are characterized by covert dealings with victims who either cannot or do not protest. A prime example is provided by the narcotics traffic." (citations omitted).

This State has enacted legislation relating to narcotic drugs, Md. Code, Art. 27, §§ 276-306D; dangerous drugs, §§ 307-313; harmful inhalants, § 313A; depressant or stimulant drugs, § 313B and 313D; LSD, 313BA; amphetamines and barbiturates, § 313C; and other hypnotic drugs, Code, Art. 43, §§ 284-289. The statutes prescribe certain conditions to effect control of such drugs and proscribe certain acts with regard to them, making such acts crimes. The validity of such legislation is firmly established. The right of the State to exercise such power was recognized by the Supreme Court in *Minnesota ex rel. Whipple v. Martinson*, 256 U. S. 41 as in the interest of the public health and welfare and reaffirmed in *Robinson v. California*, 370 U. S. 660. Unlawful drug traffic is by its nature clandestine; its operations are carried on by stealth, and become apparent primarily through its victims. But its victims are also criminals, not by reason of being addicts, *Robinson v. California, supra,* but,

because, notwithstanding their addiction, they are responsible for certain of their acts, even though stemming from their addiction, which are crimes, as for example, possession and control of a narcotic drug. Code, Art. 27, § 277. See *Powell v. Texas,* 392 U. S. 514. Unlawful drug traffic requires a number of participants and a sophisticated organization. Starting with the source of the drug, it then must be distributed, ultimately reaching the user. Along the way it passes through many hands but it is obvious that the farther from the user and the closer to the source the trail runs, the more difficult is the detection of the criminal agent. One "pusher" may sell to a number of addicts; one supplier may supply the drug to a number of "pushers;" one distributor may distribute the drug to a number of suppliers, and so on back to the original source. And even detection at the user echelon is difficult, for unlike the victims of most other crimes, the user himself, having violated the law, is loath to inform the authorities and rarely complains. See *Franklin v. State,* 8 Md. App. 134. Usually the State must act not only as policeman and prosecutor, but also as complaining witness to the crime. Thus, the great majority of the time,[6] the effective enforcement of the drug laws requires the assistance of informers who impart information to the police, often for reward.

## III

### THE INSTANT CASE

Erwin Randolph Nutter (appellant) was found guilty at a court trial in the Criminal Court of Baltimore of having under his control, on 16 March 1968, the narcotic drug Cocaine. He contends: (1) the trial court erred in refusing to require disclosure of the identity of an informer although admitting evidence as to the informer's

---

6. "It is safe to say that ninety-five per cent of all federal narcotics cases are obtained as a result of the work of informers, whether they be paid or not." *Informers in Federal Narcotics Prosecutions,* 2 *Columbia Journal of Law and Social Problems* (1966) p. 47. We understand that there is a comparable percentage as to such cases in this State.

activities, and (2) the evidence was not sufficient to sustain the conviction.

At the start of the trial appellant expressly waived any objection to his arrest or to the search and seizure by which evidence was obtained, conceding that the search and seizure were valid.[7]

Evidence adduced showed that appellant had been the proprietor of and a barber in the Ebony Barber Shop, located at 1524 Pennsylvania Avenue for about 20 years. Access to the shop from Pennsylvania Avenue was by a glass door leading into a small vestibule. There was a plate glass window overlooking Pennsylvania Avenue. The shop consisted of a room 12 feet wide and 20 feet long. There were three barber chairs on the right side of the room in a line from front to back. For each chair there was a washbasin, located on the left side wall, on which wall there were also cabinets and a mirror. Chairs for customers awaiting service were along the left wall. On 16 March 1968 the police searched the shop under the authority of a search and seizure warrant. At the time of the raid appellant was the only barber on the premises and he was in the front of the shop by the first barber chair. Several men were seated on the chairs along the left wall but no one was receiving tonsorial services. The washbasins serving the first two chairs had apparently been recently used but the basin serving the third chair at the extreme rear of the shop had obviously not been used for some time. It was a bowl type basin with two spigots and in the bowl was an accumulation of crushed up used paper towels, dirt and debris. The only contraband found in the shop was in this basin. No contraband was found elsewhere in the shop or on the person of any of the persons present, including appellant. The officer searching the third basin at the rear of the shop removed the used towels from the bowl one at a time, searching them as he removed them. As he worked his way down

---

7. It appeared that the search and seizure of the evidence was under the authority of a search warrant. By the concession of appellant the warrant did not come into evidence.

through the accumulation of towels he found 14 clear gelatine capsules rolled up in a piece of paper towel. The capsules contained cocaine hydrochloride.

The State then adduced evidence relating to occurrences on two days prior to the date of the raid. On 16 February 1968 the police were investigating possible narcotics traffic in the 1500 block Pennsylvania Avenue. There is a small alley in the rear of Pennsylvania Avenue at Smithson Street and the rear of the Alhambra Bar is on the alley. Over a period of several hours an officer observed six men on six separate occasions enter appellant's shop, have a brief conversation with appellant, leave the shop and stand on the corner of Smithson Street. A short time later appellant would leave the shop, pass the man on the corner and go by way of Smithson Street to an alley at the rear of the Alhambra Bar, which fronted on 1520 Pennsylvania Avenue. On one occasion appellant nodded to the man on the corner. The man on the corner would follow appellant into the alley, remain about 30 seconds and come out again onto Pennsylvania Avenue. The observing officer could not see either appellant or the man who had been in the shop while they were in the alley. On 2 March 1968 two officers and a third party went to the location.[8] The police searched the third party and found he had no money or narcotics on his person. They then gave him $6 and went "to a vantage point where he could be observed." They saw the third party go directly to the Ebony Barber Shop, leave a few seconds later, walk about 25 yards down the street and stop. Appellant came out of the shop, nodded in the direction of the third party and walked to Smithson Street to an areaway in the rear of the Alhambra Bar. The third party followed. They were then out of the sight of the police. About a minute later both appellant and the third party came out of the alley. The third party went back to Pennsylvania Avenue where he was met by the police.

---

8. The officer testifying called the third party "a reliable informant." Upon objection the term was stricken and he was cautioned to refer to him as "the third party."

He turned over to the police two gelatine capsules. The police again searched the third party and found no narcotics or money on his person. The capsules were sent to a U. S. chemist for analysis. The chemist's report was marked for identification but never introduced into evidence. The capsules analyzed were not produced in court and the trial judge sustained an objection to the admission of the chemist's report. Thus the evidence did not show whether or not the capsules contained a narcotic drug. The testifying officer did not know of his own knowledge what occurred in the areaway; the third party was the only person other than appellant who had knowledge of what occurred in the areaway.

Appellant testified that he used the first barber chair at the front of the shop. Two other barbers, one of whom had been working for him for 10 years and the other about 4 years, used the other two chairs but they come to work at 4:00 P.M. which was after the time of the raid. The two sinks at the front of the shop were used by all three barbers. The basin at the rear of the shop was a shampoo bowl. "It was a shampoo bowl for processing.[9] I haven't had a processor in two or three years because he had gone away and beside the bowl there was a chair that you used to sit back and the guys sit there all day and, you know, they throw everything in there from notes to cigarettes. It just gets all fouled up." He said the bowl was 10 or 12 inches deep. He never used it. He denied that there were paper towels in the basin —"Paper bags was the only thing in there and junk." In the rear of the shop was a little room used for card playing. There was a card game going on at the time of the raid. The police searched that room and the card players also. There was a door from that room leading into the alley. He said he had nothing at all to do with what the police found in the basin. "No sir. If I had, it wouldn't have been on the bottom of that, I am sure." He denied

---

9. Appellant described processing. "After you straighten your hair, you give it a rinse and you rinse it down the drain." The other two barbers did not process.

the occurrences of 2 March—"I ain't had no illegal transaction with nobody." He said he never went into the areaway. He explained that he had no telephone in his shop and "I have days when I come in there when people knock on the windows and for me to answer the telephone (in the Alhambra Bar) and that's three times a day and that's the only reason I go through that door." He stated that during February and March 1968 he was in no way related to any sort of narcotics traffic. On cross-examination he emphasized that he did not use the rear basin for anything and he did not clean it out because "it didn't pile up * * * I never had any reason to clean it up." He asserted he used cloth towels, not paper towels. Persons in the shop sit near the basin. "They sit there talking and just throw whatever they have right in there. That's it."

## (1)

Appellant made timely demand for disclosure of the identity of the agent used by the police on 2 March. He argued that the agent was an integral part of the alleged illegal transaction and requested his name and address so he could summons him as a witness. The State invoked its privilege of nondisclosure and the court refused to compel disclosure.

It is clear that had appellant been charged with the sale, possession or control of narcotics on 2 March 1968, the crime could only have been established through the testimony of the agent of the police. As a material witness on behalf of the State, his identity—real name and address—would have had to be disclosed upon demand to provide him his right of confrontation guaranteed by the Sixth Amendment and flowing to him through the Fourteenth Amendment. *Smith v. Illinois, supra.* But appellant was not so charged. The occurrences of 2 March involving the agent were adduced by the State through testimony of the police as tending to prove the crime that appellant had a narcotic drug in his control on 16 March. In rendering its verdict the trial court said:

"The testimony, which is uncontradicted, is that the Defendant was the legal occupant, possessor of this shop, had been for a number of years, and in fact that the narcotic was found in the basin on the premises over which he had control standing alone is sufficient to sustain a conviction under the second count of the indictment, that is, control. * * * So I say that standing alone without any testimony with reference to the two prior days of observations and activities I think there is sufficient evidence to sustain a conviction."

Had the trial court stopped there we would be presented only with the question of whether the trial court was clearly erroneous in his judgment on the evidence, for if he expressly did not consider the evidence as to the prior days occurrences and activities in arriving at the guilt of appellant, the identity of the agent would not have been necessary and relevant to a fair defense and in nowise material, and the admission of the testimony as to the observations of the officers, if error, would have in any event been harmless error. But the court continued:

"Entirely aside from that and as a matter of accumulative evidence, I feel that the Court was proper in admitting the testimony of the two days observations and the activities that occurred that day and I feel that although not needed that that testimony does serve as corroboration and would certainly supply some substantial evidence of knowledge on the part of the Defendant and the fact that he was involved in the narcotic traffic. So, *for those reasons,* I am going to find that he is not guilty of the first count [possession], but guilty of the second count [control]." (emphasis supplied).

In the light of this additional statement by the court, we can only conclude that it did consider the evidence of the

prior days occurrences and activities in arriving at its verdict of guilty, even though it felt it may not have been needed, and that it was considered by the court, not merely as accumulative evidence as it indicated, but in corroboration and as "substantial evidence" of appellant's knowledge of the narcotics found on the premises, as it expressed. Therefore, although the "buy" by the agent was not shown to be of a narcotic drug, the identity of the agent was necessary and relevant to a fair defense. He was an integral part of a transaction, apparently inferred by the court to be illegal, and the possible significance of his testimony in view of appellant's defense—denying that the transaction ever occurred—was obvious. In the particular facts and circumstances, since the State chose to introduce such evidence, relating to the activities of its agent, on the issue of guilt or innocence and, since we cannot say that the court did not rely thereon in finding appellant guilty, the State's privilege of non-disclosure of the agent's identity, disclosure having been demanded, must yield. We think it not without significance that after the State first adduced testimony relating only to the day of the offense charged, the court said to the Assistant State's Attorney:

> "Mr. Kaminkow, I want to make myself clear to you in sustaining the objection of the offering of the warrant. Under those circumstances, I am in no way precluding you from offering testimony on any other relevant factual situation that may be significant to this case."

Mr. Kaminkow said: "Well, in light of that, I am calling Sergeant Watkins." He did so, and elicited from Watkins the occurrences and activities of the prior days.

We hold that it was an abuse of judicial discretion not to compel disclosure of the agent's identity. In the facts and circumstances here, balancing the public interest in protecting the flow of information to the police against appellant's right to a fair defense, we think that the scales dip in favor of appellant. We reverse the judgment.

We note that we believe that evidence of the prior days occurrences and activities was properly admissible on the issue of guilt or innocence. That the occurrences and activities observed by the police on those days may have served to establish probable cause for the issuance of a search and seizure warrant, did not preclude the admission of such evidence, properly proffered, on the substantive issue of guilt or innocence.[10] See *Haley, Peterson & Roberts v. State,* 7 Md. App. 18, 29. We think such evidence fell within the exception to the general rule that evidence of the commission of other independent crimes by the defendant is inadmissible to show either guilt or that the defendant would be likely to commit the crime with which he is charged. Here such evidence was relevant as tending directly to prove the crime charged, and that crime and the occurrences and activities of the prior days were sufficiently linked together in point of time and circumstances. "If proof of another crime explains or accounts for the crime for which the accused is on trial, it is relevant and competent." *Wood v. State,* 191 Md. 658, 664. See *Bryant v. State,* 207 Md. 565, 586; *Jennings v. State,* 8 Md. App. 312 (1969). But we again point out that if the State adduced evidence as to the events of 2 March it would be obliged to disclose the identity of the agent of the police therein involved.

### (2)

In view of our reversal of the judgment we do not reach the question of the sufficiency of the evidence to sustain the conviction. Upon retrial the verdict on the charge that appellant had a narcotic drug in his control can be reached only upon consideration of the evidence then before the trier of fact. However, see *Haley, Peterson & Roberts v. State, supra,* in which we discussed "control," 7 Md. App. at 32-33. And see also *Henson v. State,* 236 Md. 518; *Scott v. State,* 7 Md. App. 505; *Wil-*

---

10. In objecting to the testimony, appellant did not rely on the defense of entrapment, nor do we think in the circumstances that he could. See *Smith v. State,* 242 Md. 712; *Simmons v. State,* 8 Md. App. 355 (1969).

*liams v. State,* 7 Md. App. 5; *Speaks v. State,* 3 Md. App. 371; *Broadway v. State,* 3 Md. App. 164.

> *Judgment reversed; case remanded for a new trial; costs to be paid by the Mayor and City Council of Baltimore.*