CARL JAMES HARDIMAN *v.* STATE OF MARYLAND

[No. 123, September Term, 1981.]

*Decided November 4, 1981.*

The cause was argued before Lowe, Couch and Weant, JJ.

*John W. Sause, Jr., District Public Defender,* for appellant.

*Philip M. Andrews, Assistant Attorney General,* with whom were *Stephen H. Sachs, Attorney General, Paul S. Podolak, State's Attorney for Cecil County,* and *John L.*

*Scarborough, Assistant State's Attorney for Cecil County,* on the brief, for appellee.

LOWE, J., delivered the opinion of the Court.

## *Prologue*

In Maryland, the prosecution has the privilege of withholding from disclosure the identity of persons who furnish information to police officers concerning the commission of crimes. *Nutter v. State,* 8 Md. App. 635, 636 (1970). The privilege is not absolute. Whether the disclosure, once demanded, is to be compelled is within the sound discretion of the court. *Gulick v. State,* 252 Md. 348, 354 (1969). Such exercise of discretion calls for a balancing of the public interest in protecting the flow of information to the police against the individual's equal, if not predominant, right to a fair defense on the merits. *Roviaro v. United States,* 353 U.S. 53, 62 (1957); *Franks v. Delaware,* 438 U.S. 154 (1978).

The exercise of discretion is proportionately restricted by the significance of the disclosure to the accused's ability to defend on the merits. If the informant merely informed, but did not witness or participate in the criminal act the judge's discretion is relatively broad; however, even his decision to disclose is subject to appellate hindsight. See *Gulick, supra.* But when it is indicated upon demand that disclosure is necessary and relevant to a fair defense on the merits, the identity of the informer *must* be disclosed if that charge is to go forward. *Nutter, supra* at 638; see also *Gulick, supra* at 354, 357; *Drouin v. State,* 222 Md. 271, 286 (1960). It is prejudicial error to withhold the identity of such undercover employees in the face of repeated demands for disclosure when the informer's

" 'possible testimony was highly relevant . . .,' "

as that which

" 'might have disclosed an entrapment . . .,' "

or that an informant

> " 'might have testified to petitioner's possible lack
> of knowledge of the contents of [a] package that he
> 'transported' . . .'." *McCray v. Illinois*, 386 U.S. 300,
> 310 (1967), quoting *Roviaro v. United States*, 353
> U.S. at 63-64.

### The Instant Case

In the case we review, Carl James Hardiman was convicted by a jury in the Circuit Court for Cecil County of possession and distribution of methamphetamine. The State's evidence consisted solely of the testimony of an undercover police officer who testified that he had purchased an amount of methamphetamine from appellant at his home, after having been introduced to him by a confidential informant named "Tinker" or "Joe". According to the officer, Tinker simply introduced him to appellant, and the appellant negotiated and consummated the sale, after which both the officer and Tinker left appellant's trailer home.

Appellant's defense was that he had been entrapped into the transaction by Tinker (or Joe), to whom he had been introduced previously.

> "Q On December 7, 1980, were you visited at
> your home by Officer William Alan Athas, or Athas
> and one other person known to you by the name of
> Joe in the late hours of the day?
>
> A Yes, sir.
>
> Q O.K. Had you seen Joe before that date and
> time of his visit at your home with Officer Athas?
>
> A Yes, sir, I have.
>
> Q Where did you first come to meet Joe?
>
> A Well, I was introduced his being Tinker.
>
> Q You knew him as Tinker?
>
> A Yes, sir.

Q O.K. And where were you introduced to him as Tinker?

A By his brother George Keane supposed to have been.

Q Supposed to have been?

A Yes, sir.

Q When he introduced you to him, did you have any further contact with him socially or business-wise or how did you, your relationship with Joe develop?

A I seen him a couple times."

He claimed that while he and Tinker were visiting a mutual friend, he accommodated Tinker by taking a package home with him.

"Q Did there come a time when he asked you to do him a favor?

A Yes, sir.

Q Where were you when this particular request was made of you?

A At Danny Johnson's.

Q At Mr. Johnson's home?

A Yes, sir.

Q And what was it that Mr. or Joe or Tinker, whatever he chooses to call himself, asked you to do?

A He said since you live in North East, could you bring this down to your house for me?

Q And what is it that he was referring to when he said, 'Can you bring this down to your house for me?' Was it, was it this item identified as State's Exhibit No. 2?

A I don't really know; it looks like a plastic bag to me.

THE COURT: What did you say?

MR. GOODRICK [Public Defender]: He said, 'It looks like a plastic bag to me.'

BY MR. GOODRICK:

Q When you were asked by Joe to bring an item down to your house, did it look like this?

A Yes, sir.

Q Do you know what was in it?

A No, sir, I do not.

Q But you did it, did you not; you did take it?

A Yes, sir.

. . .

Q And the item that you received, you received from whom?

A I was given a package at Danny Johnson's house.

Q By whom were you given it?

A I guess it's Tinker. I don't really know; that's what I was introduced.

Q Tinker?

A You know to be —

Q So, Tinker or Joe, whatever he wants to call himself, gave you that packet. What did he ask you to do with it?

A He asked me could I bring it down to my house.

Q And that house would be the one that you occupied, the trailer?

A Yes, sir.

Q And you did that?

A Yes, sir, I did.

Q Did he tell you what he wanted you to do with it other than take it down to your house?

A He said he'd be there to pick it up."

According to appellant he did come by "to pick it up," with the undercover officer in tow in a day or two.

"Q He'd be there to pick it up and he did, in fact, come to your place, as you have testified already, on the 7th of February, did he not?

A I can't remember exact date, but he did come to my house.

Q With the officer who was in this Court earlier today, Officer Athas? You remember seeing him?

A Yes, sir.

Q Was he with him that time?

A Yes, sir."

When appellant produced the packet, both Tinker and the officer "[c]hecked it out" after which appellant told them the price, which was coincidentally the same price to which the officer had previously testified.

"Q And then what?

A And they checked it out and he said, 'How much is that?' And I says, 'It's supposed to be $65.00.' "

After having swum too far into rough waters, his counsel quickly helped him ashore:

"Q Where did you get that figure?

A Because that's what I was told.

Q Who were you told that by?

A Tinker.

Q Tinker?

A Yes, sir.

Q Tinker said $65.00. When did he tell you that?

A The day at Danny Johnson's.

Q At Johnson's?

A Yes, sir."

The money was left on the table when the officer and Tinker left the trailer, apparently also to be subsequently delivered to Tinker.

On cross-examination appellant addressed some of the more obvious implications arising from so peculiar a transaction.

"Q All right. And you're saying that the $65.00, then, would have been his, is that what you are saying?

A I guess so.

Q But yet and you're saying it was no conversation, here's a man that's supposed to own this, comes to your house and the buy is made from you. Can you explain that?

A I don't guess he wanted this officer to know or something because he was at Mr. Johnson's five or six times without him.

Q I see.

A I seen him there.

Q But you didn't say anything, 'Hey this is your $65.00,' did you?

A No, sir, I did not.

Q And you kept the money, didn't you?

A No, sir, I did not.

Q When, well, they left without the money, the money was, remained in your house, is that, isn't that what you're saying?

A At the present time, yes, sir.

Q And you say you took it up to this Johnson and gave it to him?

A Yes, sir, the next day."

While it appeared from appellant's testimony that he might have known Tinker well enough to have been entrusted with his possessions (as well as his money) and that Tinker had been to his home once or twice,

"Q All right, but Tinker was not at your house before 9:00 on February the 7th? That night, that was the first time he was at your house was that night with Trooper Athas, is that correct?

A No, sir, he was there once or twice before with —,"

appellant denied knowing Tinker's true identity.

This trial testimony conformed with appellant's pretrial proffers in, and on, his Motion to Compel Discovery of the undisclosed informant. Consistently he had proclaimed his purpose in demanding the informant's name. As incredibly

naive (or inherently unbelievable) as appellant's story may make him appear, it is not our role on appeal, nor the trial judge's on weighing the demand, to decide the credibility of a proffered defense submitted to assess the purpose of disclosure. Appellant contended then, and contends now, that he was entrapped and his purpose in requiring the State to furnish him "the name and address of the confidential informer known as 'Joe' or 'Tinker' " was to verify his version of the incident. Without Tinker's tale, it would be appellant's word, credibly crippled by prior convictions and an unspoken missing witness inference, against the word of an officer of the law. Tinker's tale told as his own, appellant believes, would have vindicated him.

We are in no position on appeal to say him nay for our role of factfinding upon review is severely limited. See *Jackson v. Virginia,* 443 U.S. 307 (1979). Review of the record reveals that appellant clearly met his burden of showing that disclosure of the informant's identity was necessary and relevant to a fair defense by proffer in furtherance of his demand for disclosure. *Whittington v. State,* 8 Md. App. 676, 678 (1970).

There was nothing for the judge to balance on the suppression side of the scale as far as this record reveals. No hearing was held on the Motion to Compel Discovery save only a colloquy between counsel and the court on the morning of trial. Despite appellant's repeated proffers of the purpose of proving his entrapment defense, the State was never called upon to respond at a hearing with a reason for its denial of disclosure; although it had set forth three "reasons" in an unverified Answer to Motion to Compel Discovery.

> "1. The evidence as produced at the Motion to Suppress does not indicate in any way that the defendant was induced to commit the offense which he would not otherwise have committed.
> 2. The State at the present time does not know the whereabouts of 'Joe' AKA 'Tinker.'
> 3. The testimony of 'Joe' AKA 'Tinker' is not material to the defense of the accused."

The first and third response are not reasons at all. They are conclusions; the first a non sequitur and the third a conjecture. If the testimony of Tinker was that which was proffered, it was certainly "material" regardless of how a factfinder might receive it. The State's second answer, if evidentiarily proven, may have been justified in responding to the request to disclose Tinker's whereabouts. It does not respond to why the State should not disclose Tinker's proper name or his last known address.

The record also revealed a unique substitute for a hearing. On the day of trial when the court was called upon by counsel to rule upon his motion, the judge sent him to the State's Attorney

> "to see if either the State's Attorney or any personnel there could tell you about your question."

Counsel's inquiries to the police officer and the Assistant State's Attorney as to Tinker's whereabouts received the reply that counsel should seek the information by hearing on the motion in court. Upon reporting back to the court, rather than proceeding with a hearing, the judge recited for the record what he (the judge) had personally done.

> "I immediately went to the State's Attorney's Office, where I met Mr. Scarborough and Trooper Athas and some other officers. And they told me that they did not know where he was and gave me certain other information that tended to substantiate and confirm that they didn't know where he was. This was followed by two telephone calls to relatives of the individual, made in my presence and while I listened, and neither of those persons knew where he was, nor had heard from him for quite some time.
>
> And I am satisfied from your efforts and my efforts and the candidness and steps taken by the State's Attorney's Office and the State Police that they do not know where he is and that they do not know how to go about finding out where he is, and period."

For purposes of our review that well intentioned — if somewhat unprecedented — procedure, is not a sufficient substitute for a hearing despite the fact that we are assured by the judge that he

> "has tried to be very objective and have the interest of the Defendant very much in mind in [his] conversation with the State's Attorney's Office and the State Police, and tries now to relate very honestly what happened and his feelings about the matter and his belief as to the inability to find the individual."

The State was never called upon to justify its nondisclosure, as far as this record reveals. Even if we were to accept the judge's confirmation of the State's allegation of ignorance of Tinker's whereabouts (which is obviously beyond our judicially cognizable ken) the more pointed problem, according to appellant on this appeal, was Tinker's identity rather than his address. Counsel doggedly persisted in seeking disclosure of his identity.

> "MR. GOODRICK: Did the Court learn of the name of Joe or Tinker?
> THE COURT: Yes.
> MR. GOODRICK: Would the Court direct the State's Attorney to release that information?
> THE COURT: No."

When asked for the reason for his refusal:

> "MR. GOODRICK: Would the Court put on record why?",

the court replied:

> "Because of matters of security with respect to the individual, his own personal safety."

Nowhere in the record is there even an evidentiary suggestion that the personal safety of the informant had been jeopardized. Even during trial the only allusion came when an officer was asked generally to describe a confidential

informant to the jury. His lengthy definition concluded with
the sentence:

> "And the information given is also of a confidential
> nature to ensure the informant's safety."

In relation to Joe or Tinker, however, some such suggestion
was made but once again only in a general way indicating
that it was a procedurally anticipatory safeguard rather
than due to a direct or known personal threat of harm to
Tinker (or Joe as he was alternately called).

> "Q O.K. And is that the way this fella, Joe,
> operated in relationship to this case?
>
> A That's correct.
>
> Q O.K. As a part of your relationship with him or
> any agreement with him, what was involved with
> reference to would he ever be required to be a wit-
> ness in any case?
>
> A He voluntarily offered his assistance and as in
> return for the voluntariness of his assistance, he
> was informed that he would not have to testify.
>
> Q O.K. Is that, again, a security measure?
>
> A That's correct."

Again we note that this is all post-mortem. The testimony
is trial testimony relating to the disclosure issue. Disclosure
was denied without any taking of evidence, or even proffer
of evidentiary facts by the State. Yet even considering this
after the fact testimony, the scale tilts heavily in favor of
disclosure, indicating that the original error was clearly not
a harmless one. On the State's side of the scale is a general
rule of *procedural* security, but without any evidence of a
threat to Tinker personally. On the appellant's side of the
scale, as in *Roviaro,* were the facts that

> "[Tinker] had helped to set up the criminal
> occurrence and had played a prominent part in it.
> His testimony might have disclosed an
> entrapment. . . . He was the only witness who might
> have testified to petitioner's possible lack of knowl-

edge of the contents of the package that he 'transported' .... The desirability of calling [Tinker] as a witness, or at least interviewing him in preparation for trial, was a matter for the accused rather than the Government to decide." *Id.* at 64.

Absent some evidence of danger to the life or lives of the informant (or others) threatened by the revelation of the identity, there is a very small auncel on the State's side of the scale. The right to produce one's only defense must predominate over protecting the State's flow of information — as important as that purpose may be. *Id.* at 61-62.

The record reveals that appellant did all that he was permitted to do to compel revelation of the informant's name, and what he did was all that was necessary to shift the burden to the State. See *Nutter, supra* at 649. The State, on the other hand, stood silent and offered not a single auncel to its side of the judicial balance. We hold, therefore, that the judge abused his discretion by declining to compel disclosure and such failure was prejudicial error requiring reversal and retrial. See *Rovario* and *Nutter,* both *supra.* We need not, therefore, address appellant's "independent reason" for reversal

"that since a hearing was required and since Appellant was not present at two parts of such 'hearing' as was held, there was error of constitutional dimension in the procedure adopted by the court. Constitution of the United States, Amendments V, VI, XIV; Declaration of Rights, Constitution of Maryland, Articles 21 and 24; Maryland Rule 724. See also e.g., *Bunch v. State,* 281 Md. 680; *Tisdale v. State,* 41 Md. App. 149; *State v. Collins,* 265 Md. 70."

We assume that upon remand such procedural oversight will be averted.

In concluding we note that the State's reliance upon *McCoy v. State,* 216 Md. 332 (1958), was misplaced, if not

misleading. Although it seemingly concedes that "Tinker" was an integral part of the illegal transaction and may thus be subject to an exception to the general rule of nondisclosure, *Whittington v. State, supra* at 678, the State claims that there is an exception to the exception. The *"McCoy* exception," according to the State's interpretation, is that

"disclosure of the name of the informer is not required where the informer is already known to the accused."

That is neither the holding nor the dicta of *McCoy*.

The only issue related to an informant's identity in *McCoy* was whether the State's failure to *produce* the informer was a denial of due process and whether the evidence was sufficient to convict without such informer's testimony. *Id.* at 336. Disclosure or nondisclosure of an informant's identity was not even an issue in *McCoy*. Not only did *McCoy* know the informer, but he never made demand before or at trial of his identity, which was, as a matter of fact, revealed readily during the State's case.[1] *Id.* at 339. It was in that context that the Court reflected that:

"*If the accused knows the identity of the informer,* or, if the name of the informer is not known to the accused, but he fails to make proper demand at the trial for a disclosure of the identity of the informer, *there is no prejudicial error* if the accused has had ample opportunity to summon or call the informer to the trial. *Id.* at 338 (emphasis added).

---

1. "In the case at bar the defendant admitted in his statement to the police lieutenant that he knew the informer. At the trial one of the police officers disclosed the name of the informer without any demand being made. As in the *Conforti* case, several other questions were asked about the informer — whether the informer was a dope addict — whether the informer had ever been arrested — whether the police officer knew where the informer was at the time — but at no time did the defendant ask for the identity of the informer, demand that the state call him as a witness, or request the state to explain his absence." *McCoy, supra* at 339.

But harmless error which must be decided on a case by case basis, and beyond a reasonable doubt, *Dorsey v. State,* 276 Md. 638 (1976), is not to be confused with a rule of law holding that disclosure is never required where an informer's identity is known to an accused. The "rule" is quite the contrary:

> "If the identity of the informer is admitted or known, then there is no reason for pretended concealment of his identity, and the privilege of secrecy would be an artificial obstacle to proof." 8 J. Wigmore, *Evidence* § 2374, at 766 (1961).

In *Roviaro, supra* at 60, the Supreme Court clearly adhered to Wigmore's understanding of the law when it said that

> ". . . once the identity of the informer had been disclosed to those who would have cause to resent the communication, the privilege is no longer applicable."

By footnote the Court reiterated its understanding that an accused's knowledge of an informant did not support the government's right to withhold the identity — it destroyed the government's privilege to withhold it.[2]

The lead headnote in *McCoy* seems to espouse that upon which the State relies. We remind the State, however, that it is the holding of Court, not the opinion of a headnoter, that provides us the authority we must follow.

> *Judgment reversed.*
> *Case remanded for retrial.*
> *Costs are not reallocated as part of the judgment of this Court pursuant to Maryland Rule 1082f.*

---

**2.** ". . . whatever privilege the Government might have had would have ceased to exist, since the purpose of the privilege is to maintain the Government's channels of communication by shielding the identity of an informer from those who would have cause to resent his conduct." *Roviaro, supra* at 60, n. 8.