553 A.2d 730

**Eugene Michael DeLUCA**

v.

**STATE of Maryland.**

**No. 545, Sept. Term, 1988.**

Court of Special Appeals of Maryland.

March 1, 1989.

Richard M. Karceski (White & Karceski, on the brief), Towson, for appellant.

Cathleen C. Brockmeyer, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and Sandra A. O'Connor, State's Atty. for Baltimore County of Towson, on the brief), for appellee.

Argued before MOYLAN, WILNER and ALPERT, JJ.

MOYLAN, Judge.

A miscommunication unquestionably occurred in this case. The miscommunication ultimately worked to the detriment of the appellant. There is serious question, however, as to what, if any, impact it had. There is serious question, moreover, about who, if anyone, was to blame for the miscommunication.

Appellant's counsel took a passing remark by the state's attorney, made in the course of an argument over compelling the disclosure of the identity of an informant, and, without seeking anything by way of formal confirmation or commitment, chose to treat it as some sort of guarantee or stipulation. At the subsequent trial, without any effort to interview a police witness, appellant's counsel blindly took "a leap of faith" while pursuing a line of inquiry of extremely doubtful relevance. That inquiry backfired upon the appellant. He now cries that the combination of unfortunate circumstances should compel a reversal of his conviction. We emphatically disagree.

We begin our analysis by restating one of the most fundamental tenets of appellate review: Only a judge can commit error. Lawyers do not commit error. Witnesses do not commit error. Jurors do not commit error. The Fates do not commit error. Only the judge can commit error, either by failing to rule or by ruling erroneously when called upon, by counsel or occasionally by circumstances, to

make a ruling. As we pointed out in *Ball v. State*, 57 Md.App. 338, 359, 470 A.2d 361 (1984):

" 'Error' is a precise term of art in the appellate context. No matter how reprehensible their conduct, trial attorneys, civil or criminal, for the State or for the defense, cannot, by definition, commit error; their conduct can do no more than serve as the predicate for possible judicial error. As Judge Powers carefully and thoughtfully analyzed for this Court in *Braun v. Ford Motor Company*, 32 Md.App. 545, 548, 363 A.2d 562 (1976):

'*We know of no principle or practice under which a judgment of a trial court may be reversed or modified on appeal except for prejudicial error committed by the trial judge.* It is a misuse of language to label as error any act or failure to act by a party, an attorney, a witness, a juror, or by anyone else other than the judge. In other words, error in a trial court may be committed only by a judge, and only when he rules, or, in rare instances, fails to rule, on a question raised before him in the course of a trial, or in pre-trial or post-trial proceedings. *Appellate courts look only to the rulings made by a trial judge, or to his failure to act when action was required, to find reversible error.*' " (Emphasis in original).

Our inquiry, therefore, will focus not upon whether the Fates were, in major or minor measure, unkind to the appellant but upon whether the trial judge, when called upon to make a specific ruling, committed reversible error.

The appellant, Eugene Michael DeLuca, was convicted by a Baltimore County jury, presided over by Judge A. Owen Hennegan, of conspiracy to distribute cocaine. Upon this appeal, he raises the following five contentions:

1. That Judge William R. Buchanan, Sr. erroneously refused to require the State to reveal the identity of a confidential informant;

2. That the State unconstitutionally suppressed exculpatory evidence in contravention of *Brady v. Maryland;*

3. That the State's use of testimony unwittingly elicited by defense counsel because of the alleged *Brady* violation, exacerbated the prejudice;

4. That the errors referred to above were not harmless; and

5. That Judge Hennegan erroneously prevented the appellant from offering character and expert witnesses to show that the appellant had no propensity to commit the type of crime for which he was convicted.

Four of the appellant's five contentions revolve around the allegedly erroneous failure of the court to require the State to disclose the identity of a confidential informant, known as NRI 924. The whole controversy swirling about this informant is a tempest in a teapot. It deals with events so remotely situated on the far-flung periphery of this case as to be virtually meaningless.

The criminal events in this case all took place between August 3 and August 14, 1985. Four persons were ultimately indicted for conspiracy to import cocaine into the State of Maryland and to distribute it. The "kingpin" of the operation in Baltimore County was Roy Calhoun. James Skeens was Calhoun's supplier, located in Dania, Florida. Dorsey Culp was the courier, who drove from Baltimore County to Florida at Calhoun's request, picked up the cocaine from Skeens, and delivered it to Calhoun back in Baltimore County. The appellant, Eugene DeLuca, was at the very least a major purchaser from Calhoun and apparently helped to finance the purchase in Florida.

The initial investigation, involving the confidential informant, focused only on the drug-related activities of Roy Calhoun. The initial investigation was not aware of, and therefore not aimed at, the courier Culp, the Florida supplier Skeens, or the appellant. The initial investigation took place months before the critical dates of August 3 to August 14, 1985.

A 17–page debriefing of NRI 924 was a major factor in persuading Judge James S. Sfekas to authorize the installa-

tion of a wiretap on the telephone of Calhoun during the month of August, 1985. The confidential informant had been aware of drug-related activities on the part of Calhoun and numerous other persons from late in 1984. Most of the informant's observations were focused on Calhoun and upon activity in or around Signatures Bar in Baltimore County, where the informant either worked or was a regular patron. The informant was not privy to any activity other than that which took place at Signatures Bar.

All of the evidence of crime against the appellant came from seven intercepted conversations picked up by the tap on Calhoun's telephone line between August 3 and August 14; from three related surveillances, two in Baltimore County and one in Florida, on August 12 and 13; and from the search and seizure of Culp's automobile on August 14, as it was returning to Baltimore County from the Florida "pick up."

The confidential informant was not remotely involved in any of the events of August 3 to August 14. Once he had furnished the information that led to the issuance of the wiretap order, the informant dropped out of the picture. It was the wiretap itself that led to the involvement of Skeens, Culp, and the appellant. A review of the State's case on the merits of guilt or innocence reveals how utterly immaterial the confidential informant was to the crime charged and proved.

The first intercepted conversation, at 8:43 P.M. on August 3, was between Calhoun in Baltimore County and Skeens in Florida. Part of the agreed-upon procedure for the payment of money to Skeens by Calhoun was for Calhoun to turn the money over to Skeens' daughter, Linda Becker. It was arranged for Linda Becker to visit Calhoun's residence on the following day, August 4, for a pickup of "that money." In turn, it was arranged that Dorsey Culp (referred to in the telephone conversations as "the Big D") would "make a run" to Florida during the next week to pick up a quantity of cocaine.

The second intercepted conversation, at 9:59 P.M. on August 6, was between Calhoun and Culp. Calhoun asked and Culp agreed to "make a run" to Florida. It was arranged for Culp to leave Maryland for Florida on Monday, August 12. Calhoun also advised Culp that Calhoun had asked for "two extra" kilos of cocaine for Culp's personal distribution.

The third intercepted call, at 4:39 P.M. the following day, was between Calhoun and the appellant. It was agreed that Calhoun and the appellant would meet at a designated parking lot in Baltimore County on Monday, August 12. The appellant was initially surprised that the Florida "run" would not take place before August 12. In the course of that conversation, the appellant inquired, using indirect references characteristic of all of these conversations, whether Calhoun had in recent days been receiving any unwarranted attention from the Baltimore County police.

A fourth intercepted conversation, at 6:31 P.M. on August 9, was between Calhoun in Baltimore County and Skeens in Florida. Calhoun confirmed that Culp would be leaving for Florida on Monday, August 12. Skeens confirmed that Culp would return with "five plus" kilos of cocaine. There was a further discussion between Calhoun and Skeens as to financing.

The pace of activity picked up perceptibly on Monday, August 12. The police staked out the agreed-upon rendezvous point between the appellant and Calhoun. The appellant arrived at approximately 11 A.M., left his vehicle, approached Calhoun and shook his hand and then returned to his vehicle. The appellant unlocked the trunk and removed therefrom a brown paper bag, similar to a grocery bag, which appeared to be three-quarters full with the top folded down. The appellant entered Calhoun's vehicle carrying the bag and left the car a short time later without the bag. The appellant then left the rendezvous point.

A second surveillance, approximately two hours later, observed Calhoun driving to Culp's residence. Calhoun

removed from the trunk of his automobile a brown paper shopping bag with string handles. He entered the Culp residence with the bag. After a trip by both men from the residence to Culp's vehicle, in the course of which something was placed in the trunk of that vehicle, both men reentered Culp's house. Calhoun left the area at approximately 1:45 P.M., carrying nothing. Within five minutes, Culp entered his vehicle and drove away. A surveillance team followed him onto I–95 and observed him headed southbound toward Virginia.

At 5:05 P.M. on that same day, Calhoun called Skeens in Florida. He advised Skeens that Culp was "on the road." Calhoun informed Skeens that Culp was carrying enough money for five kilos. Skeens replied that Culp would receive seven or eight kilos. [The difference may have been money already delivered by Calhoun to Skeens' daughter on August 4]. Further reference was made to "a man as carrying part of the load," which was interpreted by Detective Charles J. Herring, who served as the interpreter for all of these conversations, to mean that the appellant was financing part of the purchase and expected, in turn, to receive a quantity of the cocaine.

Another Baltimore County detective, on temporary assignment to Florida, observed Culp arrive at Skeens' residence in Dania, Florida, at 10:10 A.M. on August 13. He was observed fumbling with shopping bags in the trunk of his car. At approximately 5 P.M., Culp was seen leaving Skeens' residence carrying a small, leather-like pouch and a shopping bag. At approximately 8 P.M., he left for good. He was followed to I–95 by a surveillance team, which observed him head off in a northbound direction.

On the following day, August 14, various Baltimore County surveillance teams were watching northbound I–95 in both Virginia and Maryland. One of those teams picked up Culp, heading northbound, at shortly before 5:30 P.M. Culp was stopped and arrested just before entering the Harbor Tunnel. His automobile was searched pursuant to a warrant. Eight individually wrapped packages of a white pow-

dery substance, later determined to be cocaine, were removed from the car.

At approximately 5:59 P.M., the police intercepted a telephone call between Calhoun and Skeens. Calhoun was concerned that Culp had not yet arrived and called to confirm the time of his departure from Florida. Skeens informed Calhoun that Culp had left on time and that he had "got eight."

Forty-five minutes later, another call was intercepted between Calhoun and the appellant. The appellant wanted to know whether Culp had yet returned from Florida. Calhoun responded that he had contacted Skeens and that everything went "all right on the other end."

Apparently because investigation was ongoing, the indictment against the appellant and his codefendants was not handed down until June, 1986, almost one year later.

## DISCLOSURE OF INFORMANT NOT REQUIRED

Yet another year went by before the extensive pretrial hearing of July 8, 1987 before Judge Buchanan. It was there that the appellant argued so strenuously about the need to know the identity of NRI 924. We agree with Judge Buchanan that such disclosure was not required under either federal or Maryland law. The informant had nothing to do with the merits of guilt or innocence. The conspiracy case against the appellant was based exclusively upon the surveillance and the wiretaps executed from August 3 through August 14, 1985.

The appellant relies primarily upon *Roviaro v. United States*, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957). The Supreme Court first discussed the general nature of the "informer's privilege," at 353 U.S. at 59, 77 S.Ct. at 627:

> "What is usually referred to as the informer's privilege is in reality the Government's privilege to withhold from disclosure the identity of persons who furnish information of violations of law to officers charged with enforcement of that law.... The purpose of the privilege is the

furtherance and protection of the public interest in effective law enforcement. The privilege recognizes the obligation of citizens to communicate their knowledge of the commission of crimes to law-enforcement officials and, by preserving their anonymity, encourages them to perform that obligation." (Citations omitted).

The Court then discussed the circumstances under which the privilege must yield to the defendant's need to know:

"We believe that no fixed rule with respect to disclosure is justifiable. The problem is one that calls for balancing the public interest in protecting the flow of information against the individual's right to prepare his defense. Whether a proper balance renders nondisclosure erroneous must depend on the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors."

353 U.S. at 62, 77 S.Ct. at 628–29.

Although it makes no difference whatsoever to the outcome of this case, we feel constrained to point out to the appellant that *Roviaro*, although a Supreme Court case, deals not with binding constitutional law but involves rather the Supreme Court's supervisory power over the lower federal courts. We note this only because *Roviaro* is presented to us uncritically as if it were constitutionally binding. In reviewing a conviction from a state court, the Supreme Court in *McCray v. Illinois*, 386 U.S. 300, 87 S.Ct. 1056, 18 L.Ed.2d 62 (1967), distinguished the two very different capacities in which the Supreme Court sits, pointing out, at 386 U.S. 309, 87 S.Ct. at 1061:

"This Court, therefore, has the ultimate task of defining the scope to be accorded to the various common law evidentiary privileges in the trial of federal criminal cases.... This is a task which is quite different, of course, from the responsibility of constitutional adjudication. In the exercise of this supervisory jurisdiction the Court had occasion 10 years ago, in *Roviaro v. United States* ... to give thorough consideration to one aspect of

the informer's privilege, the privilege itself having long been recognized in the federal judicial system." (Citations omitted) (Footnote omitted).

In dealing with the non-necessity to disclose the identity of the informant in the *McCray* case itself, the Supreme Court noted that where disclosure is not required even under the federal evidentiary rules, *a fortiori*, it is not required as a matter of constitutional law:

> "In sum, the Court in the exercise of its power to formulate evidentiary rules for federal criminal cases has consistently declined to hold that an informer's identity need always be disclosed in a federal criminal trial, let alone in a preliminary hearing to determine probable cause for an arrest or search. Yet we are now asked to hold that the Constitution somehow compels Illinois to abolish the informer's privilege from its law of evidence...."

386 U.S. at 312, 87 S.Ct. at 1063.

Having established that *Roviaro* is not constitutionally binding, we note that it is nevertheless persuasive and the Maryland courts have generally treated the informant privilege in essentially the same way as have the federal courts. In *Roviaro*, the decision was that the informant privilege had to yield, on balance, to the need for the defendant to know the identity. Critical to that decision was the fact that the undercover informant in question "had taken a material part in bringing about the possession of certain drugs by the accused, had been present with the accused at the occurrence of the alleged crime, and might be a material witness as to whether the accused knowingly transported the drugs as charged." 353 U.S. at 55, 77 S.Ct. at 625.

This became an established criterion under Maryland law. In *McCoy v. State*, 216 Md. 332, 140 A.2d 689 (1958), the Court of Appeals held, at 216 Md. at 336–337, 140 A.2d 689:

> "Ordinarily, the State has a privilege of non-disclosure and is not required to divulge the name of a person who furnishes information of violations of law to an officer

charged with enforcing the law. There are several exceptions to the general rule. One exception, with which we are concerned in this case, is applied whenever the informer was an integral part of the illegal transaction....

There are authorities that hold that an accused will be denied his constitutional rights if he does not know the informer, who was an integral part of the illegal transaction, and expressly makes a proper demand for the disclosure of his identity. In *Roviaro v. United States*, 353 U.S. 53 [77 S.Ct. 623, 1 L.Ed.2d 639] (1957), the petitioner was convicted of an illegal sale of narcotics to one 'John Doe.' The defendant *demanded* the identity of the alleged informer, and there was no indication that the defendant, at the time of trial, was aware of the identity of the informer. The government's refusal to disclose the identity was upheld by the trial court, but the Supreme Court ruled that this was prejudicial error." (Footnote omitted) (Emphasis in original).

*See also Drouin v. State*, 222 Md. 271, 160 A.2d 85 (1960); *Gulick v. State*, 252 Md. 348, 249 A.2d 702 (1969).

In *Nutter v. State*, 8 Md.App. 635, 262 A.2d 80 (1970), Judge Orth undertook a thoroughgoing analysis of the informant privilege in Maryland. He pointed out that even being a witness to the crime itself does not necessarily compel disclosure and that the word "material" as a qualifier for "witness" has in this context "a meaning more restrictive than its usual meaning":

"We believe that if an informer is a participant, accessory or witness to the crime it is a factor to be considered in determining whether his identity is necessary and relevant to a fair defense. And we feel that 'witness' as used in *Gulick* means a material witness, in the sense that his testimony is *important* to a fair determination of the cause. It is then that his identity becomes necessary and relevant to a fair defense. Thus in this context 'material' may be said to have a meaning more restrictive than its usual meaning. So, although an eyewitness to a crime is clearly a 'material' witness as that word is ordinarily

used, if he is an informer, simply observing an illegal transaction but not participating in it, the fact that he observes the transaction does not necessarily make his possible testimony so important as to compel disclosure of his identity in the face of the rationale of the nondisclosure privilege. *Donigan & Fisher*, cited in support of the statement in *Gulick*, said, 'When the identity of an informer becomes material to the establishment of a defense, the court will order its disclosure.' They quoted *Roviaro v. United States, supra*, in support thereof, and in *Roviaro* the Government's informer was the sole participant, other than the accused, in the transaction charged and was the only witness in a position to amplify or contradict the testimony of government witnesses. Thus it was clear, and the Court so found, that the informer was a material witness, his possible testimony being 'highly relevant and might have been helpful to the defense.' 353 U.S. at 63–64 [77 S.Ct. at 629]. *Donigan v. Fisher* concluded, pp. 215–216:

> 'Thus where the informer is an active participant in the illegal activities disclosed by him, his actions and identity can become part of the *res gestae* and concealment of his identity might hamper the accused in making his defense by depriving him of the testimony of a material witness.' "

8 Md.App. at 639–640, 262 A.2d 80 (Emphasis in original).

In *Hardiman v. State*, 50 Md.App. 98, 436 A.2d 923 (1981), Judge Lowe reviewed the Maryland and federal law and concluded that the decision to compel disclosure is one within the sound discretion of the trial court:

> "In Maryland, the prosecution has the privilege of withholding from disclosure the identity of persons who furnish information to police officers concerning the commission of crimes. *Nutter v. State*, 8 Md.App. 635, 636 [262 A.2d 80] (1970). The privilege is not absolute. Whether the disclosure, once demanded, is to be compelled is within the sound discretion of the court. *Gulick v. State*, 252 Md. 348, 354 [249 A.2d 702] (1969). Such

exercise of discretion calls for a balancing of the public interest in protecting the flow of information to the police against the individual's equal, if not predominant, right to a fair defense on the merits. *Roviaro v. United States*, 353 U.S. 53, 62, [77 S.Ct. 623, 629, 1 L.Ed.2d 639] (1957); *Franks v. Delaware*, 438 U.S. 154 [98 S.Ct. 2674, 57 L.Ed.2d 667] (1978)."

50 Md.App. at 99, 436 A.2d 923.

■ Applying that body of law, we have no hesitancy in holding that Judge Buchanan did not abuse his discretion in this case in refusing to compel the disclosure of the identity of the informant. The merits of the case of conspiracy against the appellant and others involved conduct, revealed by surveillance and wiretaps, that occurred during the month of August, 1985. The informant was not remotely involved, as participant or witness, in any of those events. The role of the informant, rather, was to contribute to the probable cause for the issuance of the wiretap order. The informant's observations, as we have already discussed, focused almost entirely upon Calhoun and upon the activity that transpired in or around Signatures Bar. Nothing reported by the informant involved the appellant at all.

Under the circumstances, there was no obligation to disclose the identity of the informant here. The appellant was groping for negative evidence of no more than fanciful relevance—the fact that the informant, in his narrations to the police, had *not* mentioned the appellant. It was never suggested that the informant possessed intimate knowledge of the entire conspiratorial apparatus. Of the key co-conspirators ultimately indicted, most of them had never been mentioned by the informant. We see no abuse of discretion on the part of Judge Buchanan in ruling that disclosure was not compelled.

DUTY TO DISCLOSE UNDER *BRADY v. MARYLAND:*

A NON–CONTENTION

The appellant's second "contention" turns out not to be a cognizable contention at all. As the second of the "Ques-

tions or Issues Presented" in the Appellant's Brief, there appears the following:

"Whether failure by State to reveal alteration in informant's characterization of defendant, coupled with misleading indications by State, led unaware defendant to introduce, through State's witness, prejudicial evidence as to informant's characterization of defendant?"

Even if that question were answered in the appellant's favor, it would not yield reversible error. It speaks only of a failure by the State and not of any failure by the trial judge. As we stated earlier, only the judge can commit reversible error. Even if the State were grievously at fault as alleged, that would do no more than lay the predicate for possible error by the trial judge.

Before it can constitute reversible error, misconduct by the State must be translated into misconduct by the trial judge in the form of, for instance, 1) a failure to compel the State to reveal information; 2) a failure to strike an answer from the record and to instruct the jury to disregard it; 3) a failure, then or later, to give a curative instruction to the jury; 4) a failure to give a defendant a continuance to prepare for untimely discovered material; 5) a failure to declare a mistrial at the defendant's request; 6) a failure to grant a new trial at the defendant's request, etc.

The Argument in ostensible support of this "Question or Issue" consumes ten pages of the Appellant's Brief. We have scrutinized it line-by-line and nowhere in it do we find any reference to any specific action requested of the trial judge and erroneously not taken by him. There is a narrative statement as to how appellant's counsel was unwittingly beguiled into asking a question that yielded an unexpected answer. There is great chagrin over the failure of the State to warn appellant's counsel that such an answer might be forthcoming. There is an extended discussion of the constitutional duty to disclose exculpatory evidence under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and its progeny.

Nowhere, however, are we pointed to a particular ruling of the trial judge that was allegedly erroneous. We can, to be sure, figure out several rulings that the appellant might have in mind. We will not, however, undertake to write the appellant's brief for him or to answer questions that have not been asked. There is one standard of review, for instance, that would be appropriate for assessing the failure to declare a mistrial. Quite a different standard of review, however, would be brought to bear upon the failure to grant a new trial. Is either issue before us? Are both issues before us? We are not going to set out in a vacuum to answer all possible questions that the appellant might have raised but did not.

### INTERLUDE

Even without reference to a specific contention, some explanation of this comedy of errors is called for because it so pervades the entire appeal that none of the actual contentions are intelligible without some understanding of how the miscommunication came about.

The affidavit offered in support of the application for a wiretap on the telephone of Roy Calhoun included 17 pages of information furnished to the police by the confidential informant known as NRI 924. The confidential informant was himself (or herself) a user of cocaine. The informant first became aware of a drug-trafficking organization involving Calhoun and numerous other persons in the latter part of 1984. The information was passed on to the police by the informant in the early part of May, 1985.

Significantly, the informant's observations all centered about activities that occurred at Signatures Bar, located at 825 Taylor Avenue in Baltimore County. It is clear that the informant was either an employee or a regular habitué of Signatures. The informant was familiar with the ownership and the management of Signatures.

The informant did, to be sure, mention some 37 persons involved with the narcotics activity centering on Signatures

Bar. What was described was a large-scale distribution center with Calhoun as a major supplier and with half-a-dozen or so other persons, all somehow associated with the management or ownership of Signatures, operating as middle level distributors. A number of individuals, who would come in and out of Signatures, were described as sub-distributors working for one or another of the higher level distributors.

The appellant was never mentioned by the informant. Neither, for that matter, was James Skeens, the Florida supplier, nor Dorsey Culp, the courier. The very existence of these persons was only discovered through the wiretaps on Calhoun's telephone. Indeed, the conspiracy that was charged and which was the basis for the conviction in this case was a conspiracy involving only the appellant, Calhoun, Skeens, and Culp. It was a conspiracy that allegedly took place between June 15 and August 14, 1985, a period of time that did not even begin to run until well after the events described to the police by the confidential informant. It was a conspiracy, moreover, to bring cocaine into the State of Maryland. It had nothing to do with the use or distribution of drugs at Signatures Bar.

What seems clear is that there were arguably two separate conspiracies and the only overlap between them was the person of Roy Calhoun. It was his involvement with distributing drugs out of Signatures Bar that led to the order for a wiretap on his telephone. The wiretaps, however, revealed a new and different conspiracy, one involved with the August 12 to August 14 importation of cocaine from Florida. This new conspiracy existed during a different time period, was designed to further a different criminal purpose, and involved a different set of co-conspirators.

Whether dealing with two separate conspiracies or, for that matter, with two separate links of the same "chain conspiracy," no one would have expected the confidential informant to know about or to mention the very existence of the appellant or of James Skeens or of Dorsey Culp. The appellant, however, perhaps because he was bereft of any

other defense, somehow came up with the idea that this lack of knowledge by the confidential informant was of great significance. Things went downhill from there.

An omnibus motions hearing was conducted by Judge Buchanan on July 8, 1987. Five separate motions were considered and the transcript of the total hearing consumed 64 pages. The appellant's motion to require the State to reveal the identity of the confidential informant was the fourth of the five motions considered and consumed 18½ pages of transcript. The so-called assurances or stipulations made by the State and now relied upon, almost obsessively, by the appellant, were all contained within one limited bit of argument by the State and involve a bare one-and-a-half pages of transcript. We report them here in some detail because we believe the appellant has taken them to be, and has characterized them in brief and argument as, something far beyond what they really were.

The context for the State's argument is all-important. The appellant had just been arguing strenuously that the failure of the confidential informant even to mention the appellant in the course of a 17–page debriefing had exculpatory significance. The State was responding that for all of his knowledge, the confidential informant was privy only to a part of the larger criminal activity, that centering on and emanating from Signatures Bar. The State was arguing that the appellant had nothing to do with Signatures Bar and, therefore, would never have swum into the ken of the confidential informant.

Approaching the critical issue of necessity for the disclosure of the informant's identity, the State, simply by way of logical argument, was making the point that the appellant did not need to compromise the identity of the informant in order to establish the simple fact that the appellant was not involved in any of the activities at Signatures Bar. The State pointed out that there were two readily accessible alternative avenues for developing that fact. One was to offer the 17–page fragment from the application for the wiretap order on Roy Calhoun. The fragment would speak

for itself in disclosing that the appellant was never mentioned within it.

The other alternative would be to call the investigative officers who conducted a number of surveillances on Signatures Bar. They would be able to testify that during the entire period of their surveillance, the appellant was never seen in or around Signatures.

It is clear to us that the State's reference to the lack of knowledge about the appellant by the informant refers to the only relevant time period then before the court—the observations made by the informant at Signatures Bar and passed on to the police, which observations formed part of the basis for the wiretap order. It was in this obvious context that the State argued that the 17–page recitation spoke for itself. The reference to other officers, moreover, was not, as the appellant now characterizes it, to the investigators of this case generally but to the officers who conducted the surveillances on Signatures Bar specifically, the results of that surveillance also forming a part of the application of the wiretap order on Roy Calhoun. The critical part of the State's argument was:

"Mr. Purcell: ... NRI 924 doesn't know anything about this defendant. Let me tell you what NRI 924 knew about....

The Court: That is what he is saying.

Mr. Purcell: He is saying—right, he can ask the investigators that, *he can put this affidavit into evidence if he wants through the person who was the affiant,* my affiants. 924, let me tell you, was a person who worked or, I don't know what they did, somebody who used to hang out at Signature's bar. Signature's bar is when we first linked up with Mr. Roy Calhoun, and for some reason he or she became an informant. This person—I will bring Detective Herring in to tell you was an intelligence person only, never witnessed anything, was not present at any arrests, knows nothing about this defendant. What that person told the police about was Signature's bar, what they saw Roy Calhoun doing at Signa-

ture's bar. The defendant evidently never went there. *Now, the defendant, his attorney that is, can ask that to any number of surveillance officers, 'Isn't it true Calhoun worked at Signature's bar or operated out of there, and isn't it true you never once saw him there?' 'Right, true.' Good. He has made his point. Why does he need 924 to say that?* (Emphasis supplied)."

The State made no reference to calling an investigating officer and asking him whether the informant ever at any time, then or later, had any knowledge of this appellant. The representations were far more limited. The State claimed simply that there were two alternatives to calling the informant as a witness to establish the limited fact that as of early May, 1985, the appellant was not involved in the activities centering around Signatures Bar. One alternative was to offer the 17–page fragment from the affidavit. The other was to call the officers who conducted the surveillance on Signatures. The State's argument concluded:

"My point is that he can get whatever information, whatever little help [that] can be gotten through other sources. But most importantly ... he or she never witnessed the defendant doing anything. And if that is the only point the defense wishes to make, he can make that through the surveillance officers or through this list of papers we are all looking at right now."

Judge Buchanan's ruling that disclosure was not required was clear-cut. It was not hedged with contingencies about alternative ways of developing the informant's lack of knowledge about the appellant. It was based upon the simple principle that the informant was not a witness to nor an active participant in the criminal events which were the gravamen of the offense charged:

"The Court: Of course, the State is privileged to withhold the disclosure of an informant's identity and to further protect the public interest and the effective law enforcement. And that is *Jones v. State* [56 Md.App. 101, 466

A.2d 895 (1983) ].[1]   However, I recognize that the privilege is not absolute.   However, *the defense has failed to show* me by a preponderance of the evidence *that the discovery concerning the informant is* necessary and *relevant* to a fair defense.   So your motion is denied."   (Emphasis supplied).

We note that Judge Buchanan's ruling was based in part upon his conclusion that the entire line of inquiry was not relevant.   We totally agree with that conclusion.   Permeating the atmosphere of this case was, with the single exception of the appellant, the universal belief of everyone else concerned—the prosecuting attorney, the police to the extent they even thought about it, the hearing judge, *and ourselves* —that the line of inquiry was so much irrelevant nonsense.   That issue having been disposed of, Judge Buchanan moved on immediately to the fifth and final issue before him at the omnibus hearing.   The appellant alone remained obsessed by the imagined significance of the negative knowledge when everyone else had, with good cause, forgotten it.

That obsession came back to haunt him when he took a "leap of faith" in cross-examining a police witness, without having interviewed that witness, and was surprised by the answer he received.   As the appellant characterizes it, "the trial testimony did not 'break' well."   Detective Charles J. Herring was on the stand.   Without in any way restricting the question to the time period during which probable cause was being gathered for the wiretap application or restrict-

---

1.   The pertinent criterion is well stated, at 56 Md.App. at 110, 466 A.2d 895:

> "In many instances, the informant's role will determine whether disclosure is warranted.   Disclosure is generally required to ensure a fair trial when an informant plays an active role in the events underlying the crime. . . .   On the other hand, disclosure is not usually necessary when the informant is a mere 'tipster' and not an active participant in the illegal activity."   (Citation omitted).

The quintessential role of the confidential informant in this case was as a "tipster."   He or she provided some of the information to support the wiretap order and then disappeared from the investigation.

ing the question to NRI 924, the cross-examination, without benefit of any prior interview, proceeded:

"Q: Isn't it true that you don't have any informants that ever mentioned Mr. DeLuca?

A: That is not true.

Q: This situation in any of your search warrants or so forth, affidavits, informants mentioned Mr. DeLuca as being a seller or purchaser of cocaine?

A: Not at the time those affidavits were prepared.

Q: That was the basis on which the wiretap was gotten, is that correct?

A: That is correct."

The door having been opened, the State, on redirect examination, sought to clarify Detective Herring's earlier response by asking, "You are saying there are informants who would have indicated that Mr. DeLuca was involved in the distribution of cocaine?" Detective Herring answered in the affirmative and the inquiry proceeded no further.

With a fervor bordering on constitutional paranoia, the appellant now insists that, by being "invited" and "encouraged" to ask the question of Detective Herring, he was "sandbagged" or lured into a trap either by the State's sinister design or by its inexcusable negligence. We see no evidence of either.

The appellant's claim that anything said by the State in the course of the argument before Judge Buchanan constituted an "invitation" or "encouragement" of him to question Detective Herring about the informant's lack of knowledge is pure fantasizing. In two separate regards, the State's argument before Judge Buchanan would fail so to qualify. First, there is the very nature or quality of the statements. Secondly, there is the matter of their content.

The State was involved simply in an argument over the limited question of whether the disclosure of the informant's identity would be compelled. The State was not remotely involved in making a representation or entering into a stipulation as to what future trial testimony would

be. That was not an issue before the court. Had the appellant then had any intention of treating a passing argument as a formal representation or a binding stipulation, some indication, by way of alerting the hearing judge and the State alike, would have been appropriate, such as:

> "The State has just made certain statements, Your Honor, and I would like the record to reflect them. Let it be understood, if such be the case, that the State is formally representing to my client at this time that if thus and such a witness were called at trial and were asked thus and such a question, the answer to that question would be thus and such. Let the record reflect that the State is herein entering into such a binding stipulation."

Absolutely nothing of that nature was said at that time or at any other time, up to and including the cross-examination of Detective Herring. The State neither stipulated to nor represented anything by way of forthcoming trial testimony.

The appellant is doubly foreclosed. It is a cardinal tenet of trial practice neither to examine nor to cross-examine a witness blindly. There is no indication that any impediment was placed in the way of counsel's interviewing Detective Herring before trial and clarifying what, if anything, Detective Herring knew about what, if anything, any informants knew about the appellant, including when they knew it and how they knew it. Ignoring the ordinary precautions, counsel simply took a risk at his peril. That is not the stuff of which appellate reversal is made.

Quite aside from the tenor of what the State said as being logical argument on another point rather than a representation as to future testimony, the appellant also took far too expansive a view of what was said. Even granting the appellant the pursuit of his irrelevant line of defense, the State posed, as alternatives to calling the confidential informant to the witness stand, 1) the offering of the pertinent part of the affidavit itself or 2) the calling of the police officers who conducted the surveillance on Signatures Bar. The affidavit would have revealed that the informant had

not mentioned the appellant in the course of his 17–page resumé of activities. The surveillance officers, whose observations were also offered in support of the wiretap application, would have revealed that the appellant was never seen going into or coming out of Signatures Bar. The State never suggested as an alternative, the calling of any investigative officers other than those conducting the surveillance or for any purpose other than reporting the results of the surveillance.

It was also abundantly clear that the State's argument referred to the absence of any knowledge of the appellant on the part of the confidential informant as of the time the wiretap application was obtained. The thrust of the State's argument was that the informant was neither a witness to nor a participant in any of the criminal activity that would be proved at trial, but served only in "an intelligence capacity" by way of furnishing the background information to support the wiretap application. With respect to that absence of knowledge as of the time of the wiretap order, nothing ever changed. The appellant would not have been surprised if he had confined his question to that time period. The State's very argument as to the alternatives to the disclosure of the informant's identity obviously are within the context of that limited time frame. Surveillance officers would testify only to the results of their surveillance, which was concluded in time for its results to be incorporated into the wiretap application. The pertinent 17 pages of the application for the wiretap, moreover, could not, by definition, refer to knowledge or events that occurred after the time the affidavit itself was prepared and submitted.

To the extent to which the appellant was surprised, he himself was the exclusive author of that surprise.

## THE MOTION FOR A MISTRIAL

The appellant's third contention is, once again, hard to pin down. Its heading "PREJUDICIAL NATURE OF EVIDENCE WAS FURTHER COMPOUNDED BY STATE'S EMPHASIS UPON THIS EVIDENCE" does not itself point

to any judicial ruling which the appellant claims was errone-
ous. Its three pages of supporting argument are more
anguished narration than a focusing upon a precise ruling
by the trial judge. In the course of that argument, how-
ever, the appellant does at least state, "[T]his prejudice
should have resulted in a mistrial." We, therefore, will
treat this contention as an allegation of error in failing to
declare a mistrial requested by the appellant. That brings
into play the standard of appellate review appropriate for
assessing claims that a mistrial should have been granted.
If we seem to be unduly fastidious in this regard, it is only
because it is impossible to determine which standard of
appellate review to employ until the precise nature of the
appellate contention becomes clear.

Involved is a single question and answer during the
cross-examination of Detective Charles Herring and a single
question and answer during the immediately ensuing redi-
rect examination of Detective Herring. The cross-examina-
tion by appellant's counsel concluded:

"Question: Isn't it true you don't have any informants
that have ever mentioned Mr. DeLuca?

Answer: That is not true."

The follow-up, on redirect, consisted in totality of:

"Question: You are saying there are informants who
would have indicated Mr. DeLuca was involved in the
distribution of cocaine?

Mr. Winelander: Objection.

The Court: You opened it up.

Answer: Yes."

At that point, the State rested its case and the trial
recessed for lunch. It was after the luncheon recess that
the appellant moved for a mistrial. The motion was denied.

It is clear from the context of the extended argument on
the motion for a mistrial as well as from the argument on
this appeal that the appellant's claim is based upon a *Brady*
violation and not upon a mere evidentiary ruling in the
course of the trial. The appellant's chagrin is not over the

fact that the redirect examination went in scope beyond the subject matter of the cross-examination, for they both dealt with precisely the same subject matter. The appellant's chagrin is not over the fact that the answer was unresponsive, for Detective Herring responded directly to what was asked him on both cross-examination and redirect examination. The appellant's chagrin is not over the fact that the answer was based upon hearsay, for the appellant's initial question directly called for a hearsay response. The appellant's chagrin is not over the fact that the answer was irrelevant, for it is the appellant alone who has been championing the supposed relevance of this entire line of inquiry. If negative knowledge were, indeed, relevantly exculpatory, it follows that positive knowledge would, with equal logic, be relevantly inculpatory. The relevance of evidence does not depend upon whether the evidence exculpates or inculpates.

Were a mere evidentiary ruling the basis of complaint, moreover, the standard of review would be that of an abuse of discretion. The trial judge is vested with wide discretion in making such "judgment calls upon the field" and an appellate court will not interfere with the exercise of such discretion absent evidence of clear abuse.

The gist of the complaint makes little distinction between what happened on cross-examination and what happened on redirect. The sore point is not the form of the question but the content of the answer. The basis for the mistrial motion was the allegedly prejudicial impact of the two virtually indistinguishable and rapid-fire answers, one on cross-examination and one on redirect. The appellant's argument is that he would never have embarked upon this misbegotten inquiry if the State had properly anticipated what he was about to do and "warned him off" such treacherous ground.

That this alleged *Brady* violation is the basis for the mistrial argument is clear from the appellant's brief:

"As to defendant here, Detective Herring's testimony, which was prejudicial, inaccurate double hearsay, was

presented to the jury through a question which the State had encouraged defendant to ask, and which supposedly would elicit a response far different than the one which was given."

The form of the question would never have bothered the appellant for an instant, had he but received the response anticipated.

As we turn, therefore, to the *Brady* question, what precisely was the information which the appellant would have liked to know but did not? What was argued at the omnibus hearing before Judge Buchanan was that the confidential informant, NRI 924, had no knowledge of the appellant at the time NRI 924 furnished to the police the information that helped to form the basis for the wiretap application. That never changed. Had the appellant's questioning of Detective Herring remained carefully within that time frame, the appellant would never have been surprised to his regret.

After the wiretaps were executed and after, a year later, the indictment was handed down, a newspaper account reported the indictment. NRI 924 and one or two other unnamed denizens of the "underworld milieu" apparently had a gossip session. In the course of that gossiping, they ran down the catalogue of indictees and exchanged observations as to each. When the name of the appellant was reached, one of the others informed NRI 924 that the appellant was involved in the narcotics traffic as a financial backer. NRI 924 never had any personal knowledge of this, then or later, but was at least the recipient of this gossip.

NRI 924's Baltimore County Police contact was Detective William Brady. In the course of one of their periodic debriefing sessions, NRI 924 passed along that gossip, with respect to the appellant and others alike, to Detective Brady. Detective Brady, in turn, remarked upon it to Detective Herring. This was the basis for Detective Herring's response, "That is not true," when asked by appellant's counsel whether it was correct that Detective Herring

did not "have any informants that have *ever mentioned* Mr. DeLuca?" NRI 924 *had mentioned* DeLuca. That mention of DeLuca by NRI 924 is the sum total of the material allegedly suppressed by the State in violation of the due process clause. Is that what *Brady* is all about? We think not.

NRI 924's mention of DeLuca to Detective Brady, of course, had consisted of nothing more than the fact that DeLuca, along with a number of others, had been the object of conversational gossip in terms of his criminality. NRI 924's mention of DeLuca would not have been remotely admissible at DeLuca's trial, either for him or against him. We have no idea who NRI 924's gossipy hearsay declarant may have been, no idea what the basis of that declarant's characterization was, and no idea whether it involved events charged in the indictment on trial.

Just as *we* believe that idle and undifferentiated gossip engaged in a full year after the crime occurred was of absolutely no relevance, materiality, or other consequence, both the prosecutors and the police were reasonably privileged to anticipate our belief in this regard. Once the wiretap had been obtained in the summer of 1985, NRI 924's mission was over and done. Although of continuing utility to the Baltimore County Police Department on other matters, he (or she) had no further role to play in this case. The change of circumstances to which the appellant attaches such great significance consisted simply of this: In the summer of 1985, NRI 924 knew nothing about DeLuca's criminality; one year later, NRI 924 still knew nothing directly about DeLuca's criminality but had, in the course of a conversation, heard DeLuca's criminality discussed by others.

Quite aside from the fact that the prosecuting attorney had never even heard about the gossip reported by NRI 924, he would have had no conceivable reason, even if he had heard about it, to conclude that it qualified for compelled disclosure under *Brady*. The prosecutor was not required to anticipate 1) that the appellant would rely upon

an imagined representation that the prosecutor was never conscious of having made, 2) that the imagined representation would go in scope far beyond anything ever said by the prosecutor, 3) that the appellant would pursue a line of inquiry of no reasonable relevance, 4) that the appellant would do so without talking to witnesses in advance, and 5) that the appellant would never seek anything by way of formal or informal confirmation that a representation had ever been made or what that representation had consisted of.

If the prosecutor had no obligation to fathom the vagaries of the defense thought process, the police had even less duty to do so. They had not even been present at the omnibus motions hearing before Judge Buchanan and had not, therefore, even heard the argument about disclosing the informant's identity that lit the errant fuse in the mind of appellant's counsel. That hearing before Judge Buchanan had consisted only of legal argument, with no witnesses having been called. There was no reason for the police officers or the prosecutor to give this trivial incident so much as a passing thought.

*Brady* operates on a far loftier plateau and deals with evidence of a totally different dimension. *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), announced for the first time a general prosecutorial duty, under the due process clause, to disclose exculpatory, material information. In that case, Brady, who was one of two persons charged with first-degree murder perpetrated in the course of an armed robbery, explicitly requested a copy of the codefendant's confession. The critical issue for sentencing purposes was which of the two robbers was the actual gunman. While showing defense counsel several other confessions of the codefendant, the prosecution deliberately withheld the statement in which the codefendant admitted to having been the triggerman.

Brady was convicted and sentenced to death. Only later was it revealed that the suppressed confession of the codefendant would have shown that the codefendant, rather

than Brady, had been the triggerman. In vacating the death sentence, albeit leaving the guilty verdict undisturbed, the Supreme Court held, at 373 U.S. at 87, 83 S.Ct. at 1196–97:

> "We now hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."

In defining further what "evidence favorable to an accused" is, the Supreme Court referred to it as "evidence on demand of an accused which, if made available, would tend to exculpate him or reduce the penalty." 373 U.S. at 87–88, 83 S.Ct. at 1197. Our first, obvious observation is that the evidence in issue in this case was not "exculpatory" or "favorable to [the] accused." It was, in fact, inculpatory. Had appellant's counsel been told, "The confidential informant has picked up some gossip implicating your client," such information would neither "tend to exculpate him" nor "reduce the penalty."

There is the further problem of what is suppression and when does it occur. *Brady* and its progeny deal not, as here, with discovery sufficiently timely to enable the defense team to calibrate more finely its trial tactics but with the very different issue of withholding from the knowledge of the jury, right through the close of the trial, exculpatory evidence which, had the jury known of it, might well have produced a different verdict. Suppression contemplates the ultimate concealment of evidence from the jury, not the tactical surprise of opposing counsel. The *Brady* sin is hiding something and keeping it hidden, not hiding something temporarily in order to surprise someone with a sudden revelation. Even if the latter were just as sinful, it would be a different sin with a different name. The appellant seems to be giving us a discovery issue—arguably necessary discovery to assure proper trial preparation—

cloaked as a suppression issue.[2]   At best, we are getting a
blending of two different doctrinal strains.

2. We are giving the appellant the benefit of every doubt in even
treating this case as a suppression issue involving *Brady*. *Weatherford
v. Bursey*, 429 U.S. 545, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977), bearing a
very strong resemblance to the case at bar, would seem to indicate
that this is not a *Brady* problem at all.
   In investigating the defendant Bursey, Weatherford was a police
undercover agent posing as a co-conspirator.   Even following their
joint arrest and right up to the day of trial, Weatherford maintained
that role.   He [an agent of the Government] *affirmatively represented*
to Bursey that he, Weatherford, would not be a witness at the trial.
The Court of Appeals for the Fourth Circuit reversed Bursey's convic-
tion on the ground "that Bursey had been denied due process of law
under Brady v. Maryland ... by concealment of Weatherford's identi-
ty until the day of trial and by Weatherford's statement that he would
not be a witness, *all of which lulled Bursey into a false sense of security*
and interfered with his preparations for trial."   429 U.S. at 550, 97
S.Ct. at 841.   (Emphasis supplied).
   The opinion of the Fourth Circuit, 528 F.2d 483 (1975), described
the *Brady* violation in language redolent of the appellant's present
complaint.   The Supreme Court, at 429 U.S. at 559, 97 S.Ct. at 845,
summarized the Fourth Circuit holding in this regard:
   "Because under *Brady v. Maryland* ... the prosecution has the
   'duty under the due process clause to insure that "criminal trials are
   fair" by disclosing evidence favorable to the defendant upon re-
   quest,' the Court of Appeals also held that the State was constitution-
   ally forbidden *to 'conceal the identity of an informant* from a
   defendant during his trial preparation,' *to permit the informant to
   'deny up through the day before his appearance at trial that he will
   testify* against the defendant,' *and then to have the informant 'testify
   with devastating effect.'*   528 F.2d, at 487.   *This conduct,* the Court
   of Appeals thought, *lulled the defendant into a false sense of security*
   and denied him 'the opportunity (1) to consider whether plea
   bargaining might be the best course, (2) to do a background check
   on Weatherford for purposes of cross-examination, and (3) to at-
   tempt to counter the devastating impact of eyewitness identifica-
   tion.'"   (Citation omitted) (Emphasis added).
   In reversing the Fourth Circuit, the Supreme Court held flat-out that
the entire issue, not involving ultimate suppression of anything and
certainly not the suppression of exculpatory evidence, was not a *Brady*
issue at all but a discovery claim that has no grounding in the
Constitution:
   "Again we are in disagreement.   *Brady* does not warrant the Court
   of Appeals' holding.   It does not follow from the prohibition against
   concealing evidence favorable to the accused that the prosecution
   must reveal before trial the names of all witnesses who will testify
   unfavorably.   There is no general constitutional right to discovery
   in a criminal case, and *Brady* did not create one....   *Brady* is not

*United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), was a full-fledged explication of *Brady*. It reaffirmed that "exculpatory" means "exculpatory" as it referred to the subject matter of *Brady*'s duty to disclose as "evidence highly probative of innocence." 427 U.S. at 110, 96 S.Ct. at 2400. In minimizing any difference between a general request for *Brady* material and no request at all, it referred again to the type of evidence that is truly "exculpatory" within the contemplation of *Brady:*

"If there is a duty to respond to a general request of that kind, it must derive from *the obviously exculpatory character of certain evidence* in the hands of the prosecutor. But if the evidence is *so clearly supportive of a claim of innocence* that it gives the prosecution notice of

---

implicated here where the only claim is that the State should have revealed that it would present the eyewitness testimony of a particular agent against the defendant at trial."
429 U.S. at 559–560, 97 S.Ct. at 845–46.

The Supreme Court did go on to consider the general due process implications of the alleged governmental duplicity and found that there was no due process violation. With respect to the governmental misrepresentation, the Supreme Court found that it was not deliberate. Good faith, therefore, has a curative effect in this regard that it would not have in a true *Brady* situation:

"In terms of the defendant's right to a fair trial, the situation is not changed materially by the additional element relied upon by the Court of Appeals, namely, that Weatherford not only concealed his identity but represented he would not be a witness for the prosecution, an assertion that proved to be inaccurate. There are several answers to the contention that the claim of misrepresentation is of crucial importance. The first is that there was no deliberate misrepresentation in this regard: The trial court found that until the day of trial Weatherford did not expect to be called as a witness; until then he did not know that he would testify."
429 U.S. at 560, 97 S.Ct. at 846.

The Supreme Court also found that due process is not violated simply because unexpected testimony has a "devastating" impact:

"As for Bursey's claimed disability to counter Weatherford's 'devastating' testimony, the disadvantage was no more than exists in any case where the State presents very damaging evidence that was not anticipated."
429 U.S. at 561, 97 S.Ct. at 846.

For present purposes, it seems quite possible that what we are, for the sake of argument, treating as a *Brady* suppression issue is not a *Brady* suppression issue at all.

a duty to produce, that duty should equally arise even if no request is made." (Emphasis supplied).

427 U.S. at 107, 96 S.Ct. at 2399.

*Agurs* also reinforces our conclusions both 1) that *Brady* is concerned with a direct impact on guilt or innocence rather than an impact on the conduct of the trial and also 2) that incriminating evidence, as in this case, is not *Brady* material:

"It has been argued that the standard should focus on the impact of the undisclosed evidence on the defendant's ability to prepare for trial, rather than the materiality of the evidence to the issue of guilt or innocence. . . . *Such a standard would be unacceptable* for determining the materiality of what has been generally recognized as 'Brady material' for two reasons. First, *that standard would necessarily encompass incriminating evidence as well as exculpatory evidence,* since knowledge of the prosecutor's entire case would always be useful in planning the defense." (Citation omitted). (Emphasis supplied).

427 U.S. at 112 n. 20, 96 S.Ct. at 2401 n. 20.

Linda Agurs was convicted of the second-degree murder of a casual male friend in a cheap motel room. Her only defense was that she had stabbed him in an act of justifiable self-defense. It was not until three months after the jury had rendered its verdict that her counsel discovered that the prosecutor had failed to disclose to the defense the prior criminal record of the victim for violent crime and other evidence of his violent character. Because such evidence would have been admissible in the District of Columbia, the District of Columbia Court of Appeals reversed the conviction on the grounds that this non-disclosure was a *Brady* violation. The Supreme Court reversed the District of Columbia Court of Appeals, holding that the non-disclosed evidence, although it might have been helpful to the conduct of the defense, was not material in the sense of proving innocence:

"[T]here is 'no constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case.' ... The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." (Citation omitted) (Footnote omitted).

427 U.S. at 109–110, 96 S.Ct. at 2400. The Supreme Court expressly rejected any notion of elevating discovery questions to the level of constitutional law:

"The Court of Appeals appears to have assumed that the prosecutor has a constitutional obligation to disclose any information that might affect the jury's verdict. That statement of a constitutional standard of materiality approaches the 'sporting theory of justice' which the Court expressly rejected in *Brady*. For a jury's appraisal of a case 'might' be affected by an improper or trivial consideration as well as by evidence giving rise to a legitimate doubt on the issue of guilt. If everything that might influence a jury must be disclosed, the only way a prosecutor could discharge his constitutional duty would be to allow complete discovery of his files as a matter of routine practice.

Whether or not procedural rules authorizing such broad discovery might be desirable, the Constitution surely does not demand that much." (Footnote omitted).

427 U.S. at 108–109, 96 S.Ct. at 2400.

In its broader analysis, leading up to the consideration of the shifting standards of materiality, *Agurs*, at 427 U.S. at 103, 96 S.Ct. at 2397, pointed out that the Rule of *Brady* "applies in three quite different situations. Each involves the discovery, after trial, of information which had been known to the prosecution but unknown to the defense." In speaking of "discovery after trial," the Supreme Court continues to distinguish between being surprised in the course of the trial and being surprised after the verdict has been entered. Of the three "quite different situations"

where *Brady* would apply, two of them are obviously inapplicable to this case.

The first situation is where it is discovered that the prosecution's case included perjured testimony and that the prosecution knew, or should have known, of the perjury:[3]

> "[T]he Court has consistently held that a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." (Footnotes omitted).

It is this situation, where the prosecution has knowingly used or subsequently condoned the use of perjured testimony, that the materiality standard is most favorable to the defense. In such cases, a reversal is called for "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." 427 U.S. at 103, 96 S.Ct. at 2397. This is the equivalent of the harmless error standard, which requires the prosecution to show beyond a reasonable doubt that the constitutional error did not contribute to the verdict obtained. The reason for holding the prosecution to a rigorous standard of performance in such a situation is clear:

> "In those cases the Court has applied a strict standard of materiality, not just because they involve prosecutorial misconduct, but more importantly because they involve a corruption of the truth-seeking function of the trial process."

427 U.S. at 104, 96 S.Ct. at 2398. The case before us obviously does not involve any use of perjured testimony

---

**3.** The harbinger cases that presaged *Brady* were *Mooney v. Holohan,* 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935) (involving the knowing use of perjured testimony by the prosecutor); *Alcorta v. Texas,* 355 U.S. 28, 78 S.Ct. 103, 2 L.Ed.2d 9 (1957) (a case where the prosecutor did not solicit the perjured testimony but knowingly allowed it to go uncorrected); and *Napue v. Illinois,* 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959) (a case where the prosecutor knowingly allowed unsolicited false testimony to go uncorrected, that testimony being relevant to the credibility of a key witness).

and the strict standard of materiality does not, therefore, apply in this case.

The second situation to which *Brady* applies is where, as in the *Brady* case itself, there has been a specific pretrial request for the evidence that is suppressed and later turns out to have been exculpatory:

> "The second situation, illustrated by the *Brady* case itself, is characterized by a pretrial request for specific evidence.  In that case defense counsel had requested the extrajudicial statements made by Brady's accomplice, one Boblit.  This Court held that the suppression of one of Boblit's statements deprived Brady of due process, noting specifically that the statement had been requested and that it was 'material.'"  (Footnote omitted).

427 U.S. at 104, 96 S.Ct. at 2398.  This is the intermediate level of dereliction.  Involved is an intermediate level of duty upon the State not to suppress evidence of a certain character.  A breach of this duty is not so egregious as knowingly using or knowingly condoning the use of perjured testimony.  It is one, however, where the State has at least been put upon the "alert" as to the existence of evidence favorable to the defendant because of the specific pretrial request for specific items of evidence.  The Supreme Court in *Agurs* explained why there was a different level of duty on the prosecutor in the "specific request" situation as contrasted with the "no request" or "general request" situation:

> "The test of materiality in a case like *Brady* in which specific information has been requested by the defense is not necessarily the same as in a case in which no such request has been made.  Indeed, this Court has not yet decided whether the prosecutor has any obligation to provide defense counsel with exculpatory information when no request has been made. . . .
>
> In *Brady* the request was specific.  It gave the prosecutor notice of exactly what the defense desired. . . .  [I]f the subject matter of such a request is material, or indeed if a substantial basis for claiming materiality exists, it is

reasonable to require the prosecutor to respond either by furnishing the information or by submitting the problem to the trial judge. When the prosecutor receives a specific and relevant request, the failure to make any response is seldom, if ever, excusable." (Footnote omitted).

427 U.S. at 106, 96 S.Ct. at 2398–99.

There were strong indications in *Agurs* that an intermediate level of accountability or materiality would be used to assess the prejudicial impact of a breach of this intermediate level of duty. The subsequent case of *United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), has simplified these matters by eliminating *Agurs'* intermediate level of materiality. That shifting of the materiality standard does not affect our review of this case, however, for in no event are we dealing here with a pretrial request by the appellant for specific evidence.

Even according to the appellant's "best scenario," the only *Brady* category in which he could hope to qualify would be the third. It is this which imposes the least level of duty upon the State and which requires, by way of inverse proportion, the most difficult showing of materiality by a defendant in order to justify an appellate reversal or, as requested of Judge Hennegan here, a declaration of mistrial. This is the situation where there has been either no request for specific information or, at most, a general request for "all *Brady* material" or "anything exculpatory." The Supreme Court has treated these two situations alike, holding that "there is no significant difference between cases in which there has been merely a general request for exculpatory matter and cases ... in which there has been no request at all." 427 U.S. at 107, 96 S.Ct. at 2399:

"Such a request really gives the prosecutor no better notice than if no request is made. If there is a duty to respond to a general request of that kind, it must derive from *the obviously exculpatory character of certain evidence* in the hands of the prosecutor. But if the evidence is *so clearly supportive of a claim of innocence*

432

that it gives the prosecution notice of a duty to produce, that duty should equally arise even if no request is made." (Emphasis supplied).

427 U.S. at 106–107, 96 S.Ct. at 2399.

Even in cases where the suppressed evidence is of an "obviously exculpatory character" and is "clearly supportive of a claim of innocence," a failure to disclose it to the defense, absent a specific request, will only be material enough to call for a reversal if its revelation would have significantly eroded the State's proof of guilt:

"Unless every nondisclosure is regarded as automatic error, *the constitutional standard of materiality must impose a higher burden on the defendant.*

The proper standard of materiality must reflect our overriding concern with the justice of the finding of guilt. Such a finding is permissible only if supported by evidence establishing guilt beyond a reasonable doubt. It necessarily follows that if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed. This means that the omission must be evaluated in the context of the entire record. *If there is no reasonable doubt about guilt* whether or not the additional evidence is considered, *there is no justification for a new trial."* (Footnotes omitted). (Emphasis supplied).

427 U.S. at 112–113, 96 S.Ct. at 2401–02. If there would be no justification for a new trial, there would obviously be no justification for declaring a mistrial of a trial then in progress. There is no reasonable doubt about the appellant's guilt in this case.

The *Agurs* case itself is a good illustration of how difficult it is for a defendant to prove materiality. Linda Agurs, unsuccessfully claiming self-defense, was convicted of killing a motel room "date." The State had knowingly failed to reveal the victim's record of convictions for crimes of violence. Notwithstanding the non-revelation of this propensity, which unquestionably would have been helpful to the defendant, the Supreme Court concluded:

"Since the arrest record was not requested and did not even arguably give rise to any inference of perjury, since after considering it in the context of the entire record the trial judge remained convinced of respondent's guilt beyond a reasonable doubt, and since we are satisfied that his firsthand appraisal of the record was thorough and entirely reasonable, we hold that the prosecutor's failure to tender Sewell's record to the defense did not deprive respondent of a fair trial as guaranteed by the Due Process Clause."

427 U.S. at 114, 96 S.Ct. at 2402.

*Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104, 108 (1972), also addressed the requirement of materiality:

"We do not, however, automatically require a new trial whenever 'a combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict....' "

The latest word from the Supreme Court on appropriate materiality standards is *United States v. Bagley,* 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). It was a case in which the holding of the 9th Circuit, subsequently reversed by the Supreme Court, had familiar resonances with the appellant's claim here. In that case, the defendant had specifically requested the names of the government witnesses, their prior criminal records, and "any deals, promises or inducements made to witnesses in exchange for their testimony." Despite the fact the two key government witnesses regularly received payment for furnishing confidential information to government agents, the government's response to the appellant's discovery request indicated that there had been no "deals, promises or inducements." The 9th Circuit concluded, "[W]e hold that the government's failure to provide requested *Brady* information to Bagley so that he could effectively cross-examine two important government witnesses requires an automatic reversal." *Bagley v. Lumpkin,* 719 F.2d 1462, 1464 (9th Cir.1983), quoted at 473 U.S. at 674, 105 S.Ct. at 3379.

The Supreme Court granted *certiorari* to determine the proper materiality standard. It described the case as one where "the prosecutor failed to disclose evidence that the defense might have used to impeach the Government's witnesses by showing bias or interest." 473 U.S. at 676, 105 S.Ct. at 3380. It characterized the "constitutional error, if any, in this case" as "the Government's failure to assist the defense by disclosing information that might have been helpful in conducting the cross-examination." 473 U.S. at 678, 105 S.Ct. at 3381.

Notwithstanding the Supreme Court's conclusion that there was "a significant likelihood that the prosecutor's response to Respondent's discovery motion misleadingly induced defense counsel to believe that O'Connor and Mitchell could not be impeached on the basis of bias or interest," 473 U.S. at 683, 105 S.Ct. at 3384, the Supreme Court reversed the 9th Circuit for having been "too quick on the trigger" when it came to the materiality that must be proved to justify an appellate reversal. It held first that, even in the specific request situation, the defendant must meet the high standard of materiality suggested by *Agurs* even for the "no request" situation.

In elaborating more fully upon the materiality standard first dealt with in *Agurs,* the Supreme Court engrafted onto it two cases dealing with the "standard for the materiality of undisclosed evidence" that arose "outside the *Brady* context." 473 U.S. at 681, 105 S.Ct. at 3383. In *United States v. Valenzuela–Bernal,* 458 U.S. 858, 874, 102 S.Ct. 3440, 3450, 73 L.Ed.2d 1193 (1982), the Court dealt with a case where testimony had been made unavailable to the defense by the government's deportation of witnesses. Even in such a case, reversal is called for "only if there is a reasonable likelihood that the testimony could have affected the judgment of the trier of fact." 473 U.S. at 681–682, 105 S.Ct. at 3383.

*Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), dealt with incompetence of counsel. It held that, even in cases where lawyerly incompetence has

been clearly demonstrated, reversal is not called for unless "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 473 U.S. at 682, 105 S.Ct. at 3383. In applying the *Valenzuela–Bernal* and *Strickland* standards to the *Brady* situation before it, the Supreme Court concluded:

"The evidence is material only if there is *a reasonable probability that,* had the evidence been disclosed to the defense, *the result* of the proceeding *would have been different.*" (Emphasis supplied).

473 U.S. at 682, 105 S.Ct. at 3383. In the case before us, we see no reasonable probability that, had the confidential informants' gossip session been revealed to appellant's counsel, the result would have been different.

If we cannot see the materiality of this "tempest in a teapot," *a fortiori* we cannot fault Judge Hennegan for failing to do so when he declined to declare a mistrial. His reviewing stand was, after all, far better situated than our own. He had shared firsthand the entire course of the trial; had observed the demeanor and reactions of witnesses, lawyers, and jurors alike; was privy to the vital non-verbal communication; and was in the right position to sense the vibrations that never surface in a typewritten record. We invest wide discretion in the trial judge, especially in the mistrial situation, to have the "sense" or "feel" of the trial in progress. We interfere with the exercise of that discretion only in rare instances of clear abuse. We perceive no remote abuse here.

In summation, the peripheral information at issue here, over which the appellant raises such a ruckus, was 1) not requested, 2) not exculpatory, 3) not material, and 4) not suppressed.

## *BRADY* HARMLESS ERROR:

## A CONTRADICTION IN TERMS

By way of an anticipatory counter-punch, the appellant's fourth contention is that the failure of Judge Hennegan to

react properly to this *"Brady* violation" could not be deemed harmless error. Our response is threefold, any part of which would be fatal to the contention: 1) if there could have been harmless error, there would have been; 2) specifically, there can be no harmless error analysis not because of lack of harmlessness but because of lack of error; and 3) generally, a *Brady* error of the type urged upon us can never, by definition, be subjected to harmless error analysis.

## A. THE UTTER TRIVIALITY OF WHAT HAPPENED:

Even if, for sake of argument, we were to hypothesize constitutional error and even if it were a type of error lending itself to harmless error analysis, we would nonetheless be persuaded beyond a reasonable doubt that such error did not contribute to the verdict.

The whole incident involved but a few lines of transcript in a four-day trial. The evidence of the appellant's guilt was clear. It had nothing to do with what some unnamed "informants" had or had not heard. Guilt was overwhelmingly demonstrated by the intercepted telephone conversations, by the surveillances, and by the eight kilos of cocaine seized at the end of the "Florida run." This whole episode, we are irrevocably convinced, was as inconsequential to the jury as it is to us. Unless this case should ever be remanded to us, however, this is beside the point.

## B. WITHOUT ERROR, THERE IS NOTHING TO BE HARMLESS:

Specifically, we have found that there was no error. In this case then, one does not reach the issue of harmless error.

## C. BRADY ERROR OF THIS TYPE CANNOT BE MEASURED FOR HARMLESSNESS:

More generally, a *Brady* suppression error, with the exception of the knowing use of perjured testimony, cannot, by definition, ever be subjected to harmless error analysis.

In the context of *Brady,* even the erroneous suppression of exculpatory evidence does not constitute actual error unless the materiality requirement is also satisfied. Materiality measures the prejudicial impact of the suppression. "Harmless error" also measures prejudicial impact. These two measurements, however, are made at points significantly removed from each other on the prejudicial-impact scale. In moving along the continuum that runs from harmful impact to harmless impact, one reaches the *Brady* point of non-materiality long before one reaches the point of harmless error. Thus, the putative error is eradicated before it even has the chance to be forgiven as harmless.

In the normal harmless error situation, moreover, the court allocates to the prosecutor the burden of proving beyond a reasonable doubt non-prejudice. In the *Brady* situation, on the other hand, the court allocates to the defendant the burden of proving the reasonable likelihood of prejudice. We cannot logically entertain the possibility that the appellant can prove prejudice and that the State can simultaneously prove non-prejudice. Two diametrically opposed allocations cannot co-exist.

Climbing the ladder of harmlessness, long before one attains that high level of harmlessness necessary to excuse error as harmless, one has already surpassed that much lower level of harmlessness which eliminates the very existence of error in the first instance. The first finding renders the second a contradiction in terms.

## THE APPELLANT'S "GOOD" CHARACTER

The appellant's final contention is that Judge Hennegan erroneously curtailed his effort to offer character testimony to prove that he had neither the propensity nor the character traits necessary to commit the sort of crime here charged. Correctly applying *Taylor v. State,* 28 Md.App. 560, 346 A.2d 718 (1975), *aff'd,* 278 Md. 150, 360 A.2d 430 (1976), and *Grant v. State,* 55 Md.App. 1, 461 A.2d 524 (1983), Judge Hennegan ruled such evidence inadmissible. We do not find *Simmons v. State,* 313 Md. 33, 542 A.2d

**438**

1258 (1988), dealing with imperfect self-defense, to be apposite.

Once the wiretap evidence was in, moreover, we feel about the character evidence here exactly as we felt about it in *Grant v. State, supra,* at 55 Md.App. 39–40, 461 A.2d 524:

> "Even if properly proved, moreover, evidence of good character was of such marginal significance in this case as to be nugatory. Once the physical evidence was admitted, there was no defense to the charges at bar and the appellant mounted no defense. The only possible issue that the jury might have had to decide was whether, in light of the extremely large quantity of cocaine recovered, the appellant was a very large user or a distributor. The issue there is not one of distinguishing good character from bad character but only bad character from worse character. Even if there had been technical error in rejecting the defense evidence (and we hold that there was not), the impact was so insignificant as to be nonexistent."

After the jury heard the wiretaps, the appellant, realistically, had no defense.

JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.